992 P.2d 175

**BASIC AMERICAN, INC., a Delaware corporation, Plaintiff–Respondent–Cross–Appellant,**

v.

**Mounir A. SHATILA, an individual, and Idaho Fresh–Pak, Inc., an Idaho corporation, Defendants–Appellants–Cross–Respondents.**

No. 24589.

Supreme Court of Idaho.
Pocatello, September 1999 Term.

Dec. 22, 1999.

Moffatt, Thomas, Barrett, Rock & Fields, Boise; Dalling & Dalling, Idaho Falls; Parsons Behle & Latimer, Salt Lake City, Utah, for appellants. Raymond J. Etcheverry argued.

Hopkins, Roden, Crockett, Hansen & Hoopes, Idaho Falls; Flehr Hohback Test Albritton & Herbert, San Francisco, California, for respondent. Steven K. Brown and David J. Brezner argued.

SILAK, Justice.

Appellants Idaho Fresh–Pak (IFP) and Mounir Shatila (Shatila) appeal from an injunction and a $3.26 million judgment entered against them for misappropriation of trade secrets under the Uniform Trade Secrets Act, enacted as the Idaho Trade Secrets Act (ITSA), Chapter 8, Title 48 of the Idaho Code. We affirm.

## I.

### FACTS AND PROCEDURAL BACKGROUND

#### A. Facts

Respondent Basic American, Inc., (Basic) is a Delaware corporation. Basic manufactures dehydrated potato products. Basic has maintained a research and development (R & D) facility at Blackfoot, Idaho, since 1957. The Blackfoot facility includes offices, a laboratory and pilot plant facilities. Appellant Shatila started working for Basic in its R & D department as a research engineer in 1964, shortly after graduating from Washington State University with a chemical engineering degree.

Shatila entered an employment agreement with Basic dated April 20, 1964, which included the following provisions:

1. It is understood that EMPLOYER is engaged in the experimentation, development and research in connection with the use, manufacture and sale of various articles, products and methods of manufacture; that its business is carried on under and by virtue of various patents, inventions, secret methods, processes, special machinery and appliances which are the property of EMPLOYER and which are intended to be kept guarded by EMPLOYER as its special property; that EMPLOYER is constantly spending money

and effort to improve same; that in such employment said EMPLOYEE has become and will become familiar with the apparatus, methods, processes, tools, machinery, patents, appliances, secrets and developments of said EMPLOYER'S business; and that as part of his employment said EMPLOYEE will acquire access to the same.

2. It is agreed between EMPLOYER and EMPLOYEE that all such knowledge and information which EMPLOYEE now possesses, or shall hereafter acquire, concerning and pertaining to the business and secrets of EMPLOYER and all inventions or discoveries made or developed, or suggested by or to EMPLOYEE during said term of employment relating to EMPLOYER'S business shall, at all times and for all purposes, be regarded as acquired and held by EMPLOYEE in fiduciary capacity and solely for the benefit of EMPLOYER....

On March 5, 1968, Shatila and Basic entered into an "Employment Agreement Regarding Inventions and Secrecy, which states:

6. Employee will not disclose or reveal to any person outside Company any secret or confidential information concerning any Company product, process, equipment, machinery, design, formula, business, or other activity without prior permission of Company in writing. The obligation to protect the secrecy of such information continues after employment with Company may be terminated.

In August of 1972, Shatila became Assistant Director of R & D at Basic. Shatila became Director of R & D in 1975, and was made Vice–President of R & D in 1979. Basic developed a number of dehydrated potato products during Shatila's employment, including the "Golden Grill Hash Brown" product. The Golden Grill Hash Brown was developed after extensive testing and experimentation between 1977 and 1984. Basic experienced considerable difficulty in overcoming a certain phenomenon that commonly occurs in potato processing. The problem was eventually resolved some time in 1984, and the Golden Grill hash brown entered

commercial production later that year. Appellant Shatila was personally involved in several stages of the development of the Golden Grill product.

On January 1, 1986, Shatila terminated his employment with Basic. Shatila and Basic entered into a one-year consulting agreement on January 21, 1986, which included the following provision:

5.01 Confidentiality. CONSULTANT shall not divulge or use in any manner any confidential information, or proprietary information not in the public domain concerning or relating to [Basic], or any division, subsidiary, parent or successor thereof, that may have been acquired while an employee of [Basic], or which may be acquired in the course of his employment under this Agreement. The provisions of this paragraph 5.01 shall survive the expiration or other termination of this Agreement.

Shatila and Basic entered a series of similar agreements from 1987 until 1989. Each of the consulting agreements included a confidentiality provision similar to that set forth above. Shatila's final stint as a consultant for Basic ended in June 1989.

In September 1989, John Barnecut, Basic's general counsel, wrote a letter granting Shatila permission to do consulting work for Western Empires Corporation. Barnecut added the following limitation to Shatila's consulting:

[I]t is understood that the restrictions of confidentiality set forth in Paragraph 5.01 of the Agreement remain in full force and effect and that no confidential or proprietary information of [Basic] will be disclosed by you to Western.

Shatila responded on September 14, 1989, certifying that he "read and understood this letter and [that he] agreed with the above matters."

On April 23, 1991, Shatila wrote a letter to Basic requesting that the non-competition clause of their agreement be waived so he could seek employment with Pillsbury, Carnation, Nonpareil and appellant IFP. Basic's response, dated June 5, 1991, permitted Shatila to seek employment with Pillsbury, Car-

nation and IFP, but not with Nonpareil. Basic's response also stated:

> First of all, it is understood that the restrictions of confidentiality set forth in Paragraph 5.01 of the Agreement remain in full force and effect and that you are bound by your obligations not to disclose any confidential or proprietary information of [Basic]. Finally, it is understood that all of the terms and conditions of the Agreement remain in full force and effect except with respect to the waiver set forth above.

While working as a consultant to IFP in March 1992, Shatila began a series of experiments testing a process similar to that used to produce Basic's Golden Grill product. In May 26, 1992, IFP completed a successful pilot plant test run that produced a hash brown product similar to the Golden Grill. After less than ten days of additional testing, IFP conducted a full scale production plant run on February 9 and 10, 1993. In April 1993, Shatila applied for a patent on the process he was developing for IFP.

On April 22, 1993, David Brezner (Brezner), counsel for Basic, wrote a letter to Norman Hart, IFP's general manager. The letter stated that Basic believed that Shatila had "breached his confidentiality obligations by using [Basic's] proprietary information" in developing IFP's new "Potato Real" product. The letter also stated that this conclusion was based on "the striking similarity between the Potato Real product and the one produced by the process developed by Mr. Shatila when he was consulting for Basic." The letter also stated that Basic wished to commence an "interchange of technical information" in order to "resolve the matter short of litigation."

Hart responded on May 18, 1993, stating that IFP did not believe that its product infringed on "any protected Basic American product or technology." Since IFP believed its product was "a new technology and processing effort," Hart said IFP did not wish to "share any of [its] information concerning [its] Potato Real product with any third party."

IFP introduced its product, dubbed "Idahoan Real Hash Brown Potatoes," to the market in 1993.

## B. Procedural Background

On December 17, 1993, Basic filed this action, alleging that IFP and Shatila had misappropriated trade secrets belonging to Basic in violation of the ITSA. The complaint alleged misappropriation of trade secrets relating to the production of an instant mashed potato product as well as the Golden Grill Hash Brown. On September 21, 1994, the district court issued a protective order sealing the case file in order to protect the confidential information of the companies involved.

By February 8, 1995, Basic had identified seventy-eight alleged trade secrets which IFP and Shatila had allegedly misappropriated. Basic subsequently narrowed this list down to twenty-six trade secrets. On June 7, 1996, Shatila and IFP filed a motion for summary judgment. On November 5, 1996, the district court issued a decision on the motion, granting dismissal of some of the trade secret claims. On March 10, 1997, Basic stipulated to the dismissal of its misappropriation claims related to the instant mashed potato process, leaving only seven alleged trade secrets relating to the process for manufacturing the hash brown product.

After a bench trial, the district court issued its findings of fact and conclusions of law on May 30, 1997. The trial court ruled that "the substance of Basic's claims, as interpreted in light of the evidence produced at trial, is a single claim," which the court labeled the "Trade Secret."[1] The court also ruled that the Trade Secret consisted of information that was not generally known or readily ascertainable. The court also determined that Shatila did not develop the process independently from his own knowledge, skill and experience. Instead, the court ruled that Shatila used the Trade Secret as a starting point for developing the Idahoan

---

1. The language used by the district court to summarize the Trade Secret has been omitted from this opinion in order to protect the trade secret status of Basic's Golden Grill process. *See* I.C. § 48–804.

Real Hash Brown. The district court also ruled that IFP knew or should have known that Shatila used Basic's trade secret to develop the Idahoan Real Hash Brown product, and that by purchasing the Trade Secret from Shatila, had misappropriated the Trade Secret. The court also ruled that Shatila and IFP pursued a common plan and design in misappropriating Basic's Trade Secret, that the misappropriation was intentional, and that Shatila and IFP were jointly and severally liable.

The court further ruled that IFP and Shatila should be enjoined from using the Trade Secret, and that Basic was also entitled to damages to compensate it for losses caused by the tortious conduct of Shatila and IFP. In calculating damages, the court relied on the testimony of Gordon Lewis, vice-president of Basic. The court ruled that Lewis had "approximately fifteen years of experience in identifying, evaluating and responding to competitive threats to Basic's business," and that he therefore qualified as an expert witness under Idaho Rule of Evidence 702. In forming his opinion regarding the calculation of damages, Lewis relied on a report prepared by Roger Smith, which detailed Basic's lost sales and retention costs, as well as the amount by which IFP and Shatila were unjustly enriched by the misappropriation. The report stated that Basic suffered $401,000 in lost sales and $2,584,000 in retention costs. The report also stated that the unjust enrichment of IFP and Shatila amounted to $675,388. The court also ruled that to award both lost sales and unjust enrichment damages to Basic would be duplicative, and therefore determined that the proper amount of damages was the total retention costs plus the unjust enrichment, or $3,259,388. A judgment in that amount was entered on March 9, 1998. The judgment incorporated by reference an injunction previously entered on July 8, 1997.

## II.

### ISSUES ON APPEAL

The appellants present the following issues on appeal:

A. Whether the trial court applied the wrong legal standards to determine whether Basic had proved a trade secret under the Idaho Trade Secrets Act.

B. Whether the Trade Secret found by the trial court was impermissibly vague.

C. Whether the Trade Secret found by the trial court wrongfully impinged upon Shatila's right to use in future employment the education, skill and knowledge acquired during his employment with Basic.

D. Whether the trial court's ruling that the Trade Secret had been misappropriated by IFP and Shatila is contrary to the trial court's findings of fact.

E. Whether the trial court erred in finding that Basic had established any "actual loss" under Idaho Code § 48–803.

F. Whether IFP and Shatila are entitled to attorney fees on appeal and in the trial court.

The respondent also raises the following issue on cross-appeal:

G. Whether the trial court erred by employing a "net profit" measure to calculate the amount of the unjust enrichment award.

## III.

### STANDARD OF REVIEW

When this Court reviews a decision of the district court, it will not disturb the district court's findings of fact if they are supported by substantial and competent evidence. *See The Highlands, Inc. v. Hosac,* 130 Idaho 67, 69, 936 P.2d 1309, 1311 (1997) (quoting *Kootenai Elec. Co-op. v. Washington Power Co.,* 127 Idaho 432, 434, 901 P.2d 1333, 1335 (1995)). While this Court must defer to findings of fact based upon substantial evidence, it will review freely the conclusions of law reached by stating legal rules or principles and applying them to the facts found. *See Riley v. Rowan,* 131 Idaho 831, 833, 965 P.2d 191, 193 (1998). The credibility and weight given to evidence is in the province of the trial judge as trier of fact, but this Court is not bound by legal conclusions of the trial court and is free to draw its own legal conclusions from the facts presented. *See*

*The Highlands,* 130 Idaho at 69, 936 P.2d at 1311.

## IV.

## ANALYSIS

### A. The Trial Court's Factual Findings Support A Finding Of Trade Secret Status Under The Correct Legal Standards.

Appellants Shatila and IFP contend that the trial court applied incorrect legal standards in determining that Basic had proved a trade secret under the ITSA. The appellants argue that the trial court erroneously applied principles of patent law in determining that Basic's Golden Grill process as a whole was not generally known or readily ascertainable.

### 1. The trial court did not erroneously apply patent law.

■ As a preliminary matter, we address the appellants' argument that the district court erred in applying patent law to find a trade secret. Appellants argue that the patent law cited by the district court "effectively shifted the burden" of showing that Basic's Golden Grill process was readily ascertainable or generally known to the defendants, while the burden of proving the existence of a trade secret must generally be carried by the plaintiff.

Although the district court cited several patent law cases in its conclusions of law, none of those cases were used to place the burden of proof on one party or another. The court used these cases in support of the proposition that the alleged trade secret should be viewed as a whole in order to determine whether a claimed trade secret has been disclosed in published materials. *See Bausch & Lomb, Inc. v. Barnes-Hind/Hydrocurve, Inc.,* 796 F.2d 443, 449 (Fed.Cir.1986); *Gillette Co. v. S.C. Johnson and Son, Inc.,* 919 F.2d 720, 724 (Fed.Cir. 1990). The district court also ruled that the information contained in the Trade Secret was not "obvious" in a patent law sense.

While the district court *cited* patent law in a portion of its conclusions of law, it did not actually *apply* patent law in order to find

that a trade secret existed. The district court specifically stated in its conclusions of law that the Trade Secret was not "obvious, generally known, or readily ascertainable as those terms are used in the ITSA." While "obviousness" is a patent law concept not within the ITSA, the court's conclusion that the "generally known" and "readily ascertainable" tests were met satisfied the requirements of the ITSA.

Since the district court did not erroneously apply patent law to find the existence of a trade secret, the district court's determination that there was a trade secret will not be overturned as long as the facts as found by the trial court support the ruling when applied to the ITSA.

### 2. When applied to the definition of "trade secret" under the ITSA, the district court's findings of fact support a ruling that a trade secret existed.

■ In order to prevail in a misappropriation action under the ITSA, the plaintiff must show that a trade secret actually existed. *See* I.C. § 48–801; *Uncle B's Bakery v. O'Rourke,* 920 F.Supp. 1405, 1426 (N.D.Iowa 1996). "Without a proven trade secret there can be no misappropriation, even if the defendants' action was wrongful." *Electro-Craft Corp. v. Controlled Motion, Inc.,* 332 N.W.2d 890, 897 (Minn.1983). The trial court ruled that the substance of Basic's claims, "as interpreted in light of the evidence produced at trial," was a single claim, which consisted of introducing certain additives to potatoes which had been processed in a certain way. The trial court's formulation of Basic's claims essentially consolidated the seven remaining trade secret claims into one paragraph in order to facilitate the application of those claims to the ITSA.

The ITSA sets forth the following definition:

(5) "Trade secret" means information, including a formula, pattern, compilation, program, computer program, device, method, technique or process, that:

(a) Derives independent economic value, actual or potential, from not being general-

ly known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

(b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy....

I.C. § 48–801(5)(a)–(b). The parties stipulated at trial that Basic had taken adequate measures to protect the secrecy of the information, so the trial court needed only to address the test embodied in subsection (a). The trial court ruled that the process for manufacturing the Golden Grill product had independent economic value and that the process was not generally known or readily ascertainable. Appellants do not argue that the alleged trade secret does not have "independent economic value." They only contend that Basic failed to prove that the alleged trade secret was not "generally known" or "readily ascertainable."

The district court, in determining that Basic's Golden Grill process was not "readily ascertainable," applied the definition of that term as set forth by the drafters of the Uniform Trade Secret Act: "Information is readily ascertainable if it is available in trade journals, reference books, or published materials." Uniform Trade Secret Act § 1, Commissioners' Comment, 14 UNIFORM LAWS ANNOTATED 439 (1990). The district court, after reviewing trade manuals, reference books, numerous potato processing patents and sales brochures written by the manufacturers of food additives, found that the Trade Secret had not been disclosed by publication.

The district court also applied several factors from the Restatement of Torts § 757, comment b. After considering these factors, the court observed that no manufacturer other than Basic had produced a comparable potato product until Shatila began working for IFP. The court also noted that Basic had expended substantial effort and expertise in developing and commercializing the Trade Secret, and that it would take substantial

effort and expense for others to duplicate the alleged trade secret. After considering the coverage of trade literature and the Restatement factors, the district court concluded that Basic's Golden Grill process was a trade secret under the ITSA.

■ The district court did not err in making this ruling. Courts in Uniform Trade Secrets Act jurisdictions often apply factors from the Restatement in order to facilitate application of the tests embodied in the statute. "Although all of the Restatement's factors no longer are required to find a trade secret, those factors still provide helpful guidance to determine whether the information in a given case constitutes 'trade secrets' within the definition of the statute." *Optic Graphics v. Agee,* 87 Md.App. 770, 591 A.2d 578, 585 (1991).[2] The Restatement offers six additional factors that can be used to show that given information is a trade secret:

(1) the extent to which the information is known outside [the plaintiff's] business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and his competitors; (5) the amount of effort or money expended by him in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

RESTATEMENT OF TORTS § 757, comment b (1939). All of these factors address the issue of whether the information in question is generally known or readily ascertainable. For example, the fact that Basic spent almost six years developing the Golden Grill product is evidence that the process was not generally known or readily ascertainable. If the process were generally known or readily ascertainable, Basic (and presumably other manufacturers) would have been able to produce the desired hash brown product much more quickly. The district court's finding that Basic's Golden Grill process was unique

---

**2.** The current Restatement definition of "trade secret" is even broader than that incorporated in the Uniform Trade Secrets Act: "A trade secret is *any* information that can be used in the operation of a business or other enterprise and that is

*sufficiently valuable* and *secret* to afford an *actual or potential economic advantage* over others." RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 39 (1995) (emphasis added).

to the industry is also evidence that the process is not "generally known" or "readily ascertainable." *See Electro–Craft,* 332 N.W.2d at 899. In light of the district court's factual findings, this Court holds that the district court did not err in ruling that the alleged trade secret was not "generally known" or "readily ascertainable."

3. **Even if the district court erred in considering Shatila's patent application and the sealing of the record, there was still substantial and competent evidence to support the conclusion that there was a trade secret.**

The trial court also stated that Shatila's application for a patent on the process he developed for IFP was evidence that the process was a trade secret. Shatila and IFP argue that the district court erred in considering Shatila's patent application because Shatila was actually denied a patent. The Patent and Trademark Office determined that Shatila's claimed invention was "obvious" based on the prior art taken as a whole. Appellants argue that the Patent Office's rejection of Shatila's application is evidence that the process is "readily ascertainable" and not a trade secret. Appellants also argue that the district court erred in considering its order to seal the record as evidence that the information was a trade secret.

These arguments are not persuasive. Even if the district court erred in considering the patent application and the sealing of the record, the conclusion that the potato dehydration process was not generally known or readily ascertainable was still supported by other substantial and competent evidence. *See The Highlands,* 130 Idaho at 69, 936 P.2d at 1311. Additionally, information may be found a trade secret even if not sufficiently novel to merit patent protection. *See Electro–Craft,* 332 N.W.2d at 899. The district court, acting as trier of fact, was free to weigh the evidence presented and decide which was most credible. *See Hummer v. Evans,* 129 Idaho 274, 279, 923 P.2d 981, 986 (1996); *Viebrock v. Gill,* 125 Idaho 948, 951, 877 P.2d 919, 922 (1994).

4. **The Court need not follow the result in *Weins v. Sporleder* because the case is factually different.**

Appellants also contend that the South Dakota Supreme Court held there was no trade secret in *Weins v. Sporleder,* 569 N.W.2d 16 (S.D.1997), a case with what appellants describe as "a remarkably similar factual and procedural setting." In that case, the plaintiffs and defendant developed a cattle feed product consisting of milo flour, cane molasses, sugar, urea, ethyl alcohol, vitamins, fermentation packages and phosphoric acid. The first batches of the feed were mixed in a garage. *See id.* at 18. The parties were at that time employees at a feed company, but decided to create their own company to market the product. The relationship of the parties deteriorated, however, and the business was never incorporated. A short time later, the defendant approached another company, which began producing a similar product.

The plaintiffs sued, claiming that defendant had misappropriated the trade secret by helping another company create a similar product. The trial court ruled for the plaintiffs, but the South Dakota Supreme Court reversed, holding that the plaintiffs had not proved the existence of a trade secret. In reaching its conclusion, the *Weins* Court stated:

> It is undisputed that Weins' product is a combination of well-known feed materials provided as a feed supplement.... Combining these materials cannot be considered a trade secret if the formula was " 'within the realm of general skills and knowledge' in the relevant industry." Thus, the focus turns to the " 'ease with which information can be developed through other proper means: if the information can be readily duplicated without involving considerable time, effort or expense, then it is not secret.' "

*Weins,* 569 N.W.2d at 21 (citations omitted). The *Weins* Court also observed:

> An expert testified as to the ease of determining the contents of a feed product. By microscopy, the formula of a feed product can be established in twenty minutes. Further testimony revealed that a chemi-

cal analysis would take at most four or five days, costing around $27. This testimony clearly demonstrates the ease of duplicating Weins' formula.

*Id.*

The facts in *Weins* are easily distinguishable from those in the instant case. The process for creating the Golden Grill product involved more than just mixing readily ascertainable ingredients. The district court found that the process involved processing potatoes in certain ways and in a specific order. The process also included the application of certain additives to the potatoes at certain stages of the process. Basic developed the Trade Secret in this case only after investing a great deal of time and experimentation, while "within a month" the parties in *Weins* were "mixing a batch of feed in a garage." The fact that it took Basic almost six years to develop the process is substantial and competent evidence that it would have been difficult to duplicate the process independent of Shatila's first-hand knowledge of the Trade Secret. Given the factual differences in the two cases, this Court does not feel constrained to achieve the same result as the court in *Weins.*

This Court holds that when the facts as found by the trial court are applied to the correct legal standards, Basic proved that there was a trade secret protectable by the ITSA.

## B. The Trade Secret Found By The District Court Was Sufficiently Specific.

### 1. The district court did not err in "creating" the Trade Secret.

The appellants argue that the district court improperly "created" the Trade Secret, implying that without the court's help Basic would have failed to identify a protectable trade secret. Shatila and IFP also argue that the district court's formulation of Basic's trade secret claims was overly broad and vague. Appellants also argue that the district court's formulation of the Trade Secret was less specific than Basic's Trade Secret Claim No. 26, which the court ruled was, standing alone, generally known and readily ascertainable.

These arguments are also unpersuasive. Basic defined its trade secret claims in almost excessive detail, producing a list of nearly eighty alleged trade secrets. The list was eventually pared down to seven trade secret claims, including Claim No. 26, which the district court consolidated into a single paragraph, presumably to facilitate application of Basic's claims to the ITSA. The district court ruled that, when all of the elements were considered together, they constituted a compilation trade secret. Information consisting of multiple elements which are each readily ascertainable may still be trade secrets when considered as a whole. *See, e.g., Uncle B's Bakery, Inc. v. O'Rourke,* 920 F.Supp. 1405, 1438 (N.D.Iowa 1996); *Rohm & Haas Co. v. Adco Chem. Co.,* 689 F.2d 424, 433 (3d Cir.1982); *Integrated Cash Management Serv., Inc. v. Digital Transactions, Inc.,* 920 F.2d 171, 174 (2d Cir.1990). Therefore, even though the district court granted summary judgment dismissing Claim No. 26 as an individual claim, it ruled that Claim No. 26 "may constitute part of the overall process" and that it was dismissing the claim "[e]xcept as included as part of Basic's overall process." This Court holds that the district court did not err in consolidating the remaining claims into a more manageable form.

In *Electro–Craft v. Controlled Motion, Inc.,* 332 N.W.2d 890 (Minn.1983), the Minnesota Supreme Court faced a similar argument. In *Electro–Craft,* the appellant argued that neither the plaintiff nor the district court were "specific enough in defining [the plaintiff's] trade secrets." The appellant also argued that the plaintiff's definition of the trade secrets involved "changed during the course of the litigation." *Id.* at 898. The Minnesota Supreme Court overturned for lack of specificity the district court's finding that the "general design procedures" of the plaintiff's electric motors were trade secrets. The Minnesota Supreme Court also held that the plaintiff's claims were sufficiently specific, however:

> With respect to the moving coil motor, however, ECC claims that the dimensions, tolerances, adhesives, and manufacturing processes of the ECC 1125–03–003 motor

are trades secrets. The thrust of ECC's claim is that the specific combination of details and processes for the ... motor is a trade secret, and the evidence of the specific features of the 1125 motor are trade secrets. We believe that ECC's claim was specific enough in identifying its trade secrets to support a misappropriation action....

*Id.* The same is true in this case. The trial court's formulation does not seem vague, and even if it were, Basic's claim was still specific enough to support a misappropriation action.

### 2. The district court's formulation of the trade secret was sufficiently specific to satisfy the requirements of I.R.C.P. 65(d).

 Appellants also argue that the district court's formulation of the Trade Secret lacked the specificity required by I.R.C.P. 65(d) to provide notice of what activity was enjoined. This argument is unpersuasive. The Trade Secret specifically describes the elements which the district court found to be part of Basic's proprietary information concerning the solution to the hash brown clumping problem. After the trial, Basic filed a proposed injunction with the district court. Later, in a hearing to determine the language to be employed in the injunction, IFP and Shatila argued against the implementation of Basic's proposed injunction. Instead, IFP and Shatila argued that the injunction should employ the language set forth in the district court's formulation of the Trade Secret:

> The Court has very precisely put down what the trade secret is. And the Court got there, in part, by saying that what [IFP] does was derived or was derived starting with their technology. But fundamentally, anything that my client does in the future they are going to look to the trade secret. Here is what the Judge has enjoined; this is what we can't do.

Since Shatila and IFP did not object to the specificity of the injunction's language at the hearing, it cannot now claim that the Trade Secret is too vague to comport with the specificity requirement of I.R.C.P. 65(d).

### C. The Trade Secret Found By The Trial Court Was Not Overly Broad.

 Appellants contend that the trial court's formulation of the Trade Secret wrongfully impinged upon Shatila's right to use his skill and knowledge in the future. Appellants also argue that the court's formulation of the Trade Secret includes elements not actually used by Basic in producing the Golden Grill product, and that trade secrets law requires that compilation trade secrets must be defined narrowly and according to the plaintiff's "precise utilization" of the information.

### 1. The court's formulation of the Trade Secret does not wrongfully impinge on Shatila's right to use his knowledge, education and experience.

 Trade secret misappropriation law inherently involves balancing between the competing interests of employers and employees. First, employers have an interest in protecting from wrongful disclosure information and processes which are developed at significant company expense. Protecting trade secrets encourages innovation and development of new technologies. *See American Can Co. v. Mansukhani*, 742 F.2d 314, 329 (7th Cir.1984). Second, former employees should not be deprived of using their experience, skill and knowledge in seeking future employment. *See id.* at 329–30.

Appellants argue in favor of tipping the balance in favor of employees, especially in cases where the former employer claims trade secret status in what appellants label as "a vague and broad process that encompasses the general knowledge of those in the industry...." This argument is not persuasive; if the process involved in this case truly encompassed the general knowledge of those in the industry, then the process would have been readily ascertainable. The district court specifically found that the process was not contained in the general knowledge of the industry, stating that the manner in which the potatoes were processed, combined with the use of certain additives to solve a production problem "is known only by Basic and Idahoan." As explained above, the district court's findings of fact, when applied to

the "generally known" and "readily ascertainable" tests under the ITSA, support the conclusion that there was a protectable trade secret.

Since the trial court's formulation of the Trade Secret was sufficiently narrow to constitute a trade secret, Shatila's interest in using his skill and knowledge deserves no additional leverage when balanced against Basic's interest in protecting its investment. Shatila has not argued that the court's formulation of the Trade Secret has made it impossible for him to obtain employment. Having held that Basic's alleged Trade Secret was not generally known or readily ascertainable, this Court also holds that the trial court's ruling does not wrongfully infringe upon Shatila's right to use his training and experience.

**2. The district court's formulation of the trade secret is sufficiently narrow.**

Appellants argue that a compilation trade secret must be defined narrowly and in accordance with the plaintiff's precise utilization of the information. This argument is not persuasive. While the authorities cited by the appellants indicate that trade secrets must be defined with a degree of particularity, Basic's trade secret claims satisfy the particularity requirements as set forth in those cases.

In *Universal Analytics, Inc. v. MacNeal–Schwendler Corp.*, for example, the federal district court stated that "[w]hen making a claim for the wrongful use of trade secrets, 'the complainant should describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or of special knowledge of those persons skilled in the trade.'" 707 F.Supp. 1170, 1177 (C.D.Cal. 1989) (quoting *Diodes, Inc. v. Franzen*, 260 Cal.App.2d 244, 67 Cal.Rptr. 19 (1968)). The court in *Universal Analytics* observed, however, that the plaintiffs had failed to inform the court which trade secret had been misappropriated. *See id.* Instead, the plaintiffs in that case merely speculated that a competing business must have stolen trade secrets because that business announced improvements

in its products after the plaintiffs' employees began working for them. *See id.* At one point in the litigation, the plaintiffs conceded that the main "thrust" of its case was not grounded in its trade secrets claim. *See id.* at n. 9. Acting as the trier of fact, the *Universal Analytics* Court concluded that no trade secret had been misappropriated under those circumstances. In contrast, Basic claimed and the district court found that specific trade secrets existed in the present case. As explained above, the district court found that Basic's method of processing the potatoes, combined with the use of additives to solve the processing problem, was not within the general knowledge of the potato processing trade.

In another case cited by appellants, the Ninth Circuit Court of Appeals upheld the trial court's finding that the plaintiff had trade secret rights in the design of its tape recorder. *See Winston Research Corp. v. Minnesota Mining & Mfg. Co.*, 350 F.2d 134 (9th Cir.1965). In that case, the Ninth Circuit noted that the trial court included in its decision an outline of the plaintiffs' general approach to building the tape recorders, followed by the exact specifications for the recorders, which were developed "only after painstaking research and extensive trial and error." *Id.* at 139. The Ninth Circuit held: "As we read the findings and judgment, it was these specifications and relationships which the court found to constitute [the plaintiff's] trade secret, and not the general approach itself. . . ." *Id.* Applied to the instant case, this holding means only that Basic would have a trade secret interest only in the information it acquired after its painstaking research and experimentation, and not in the approach it used to develop the trade secret. Under the *Winston Research* rationale, Idaho Fresh Pak is free to conduct its own research to unlock the solution to the clumping problem by assigning the task to chemical engineers and food processing experts. It may not, however, wrongfully use the information which Basic acquired only after years of painstaking research and extensive trial and error. The district court found that Shatila did not use his knowledge, skill and experience to independently develop the Ida-

hoan Real Hash Brown. The district court also found that prior to Shatila's consulting work for IFP, only Basic possessed the knowledge comprising the Trade Secret. The Trade Secret, as set forth by the district court, is consistent with the Ninth Circuit's rationale in *Winston Research.*

The Trade Secret found by the district court is also consistent with the principles applied in *Microbiological Research Corp. v. Muna,* 625 P.2d 690 (Utah 1981), another case cited by IFP and Shatila. In that case, the Utah Supreme Court stated:

> Thus, a unique combination of generally known elements or steps can qualify as a trade secret, if it represents a valuable contribution attributable to the independent efforts of the one claiming to have conceived it. The combination must differ materially from other methods revealed by prior art. The subject matter of the trade secret must be unknown; it should not be in the public domain nor within the knowledge of the trade, i.e., known only to the employer and possibly several others to whom it was disclosed with the admonition that its secrecy be maintained.

*Microbiological Research Corp. v. Muna,* 625 P.2d at 696 (quoting 2 Callman Unfair Competition, Trademarks and Monopolies § 51.1 (1967)). The district court found that the Trade Secret was a unique combination of generally known elements which was not in the public domain. The district court also found that the combination was developed by Basic after considerable effort and expenditure, and was known only to Basic until Shatila began consulting for IFP. The Trade Secret found by the district court is therefore consistent with the principles set forth in *Muna.*

Finally, Shatila and IFP argue that a plaintiff may sustain a trade secret only by narrowly defining and distinguishing the claim from public domain information, citing *American Can,* 742 F.2d at 329–30. In that case, the American Can Company had established trade secrets in its jet spray ink formulas, securing a permanent injunction against a former employee who began producing competing inks, some of which were substantially identical to those developed by American Can. *See American Can v. Mansukhani,* 216 U.S.P.Q. 1094, 1982 WL 63796 (E.D.Wis.1982).

American Can later filed *ex parte* motions contending that Mansukhani was violating the injunction. American Can first obtained relief in the form of a temporary restraining order, and was granted a preliminary injunction shortly thereafter.

The additional injunctive relief was overturned on appeal, however, because the new injunction protected information outside the scope of the trade secrets which the trial court found to be valid in the original litigation. *See American Can,* 742 F.2d at 329–330. The Seventh Circuit held that while American Can was entitled to effective protection for the trade secrets which the court originally found, it was not entitled to protection for information that had not been found to be trade secrets. *See id.* at 329–30. The *American Can* opinion addressed the scope of relief to which the owner of trade secrets is entitled, not the degree of particularity with which a plaintiff must define its trade secret claims. In the instant case, the district court specifically found that while elements of the trade secret were in the public domain, the particular combination claimed by Basic was not in the public domain. We conclude that the Trade Secret, as claimed by Basic and formulated by the district court, was defined with sufficient particularity to distinguish it from the public domain.

**D. The Trial Court's Ruling That The Trade Secret Had Been Misappropriated By IFP And Shatila Is Not Contrary To The Trial Court's Findings Of Fact.**

Appellants Shatila and IFP argue that the "definitive issues in this appeal . . . are (1) did Mr. Shatila violate a legal duty of confidentiality that he owed to BASIC under his consulting agreement; and, (2) did IFP breach a legal duty which it owed to BASIC?" Appellants argue that when the facts as found by the district court are applied to the "proper legal standards . . . . it is clear that neither Shatila nor IFP violated any legal duty to Basic."

These arguments are unpersuasive. Shatila and IFP attempt to characterize their appeal as a matter of contract law. While Basic's complaint included claims for both breach of contract and misappropriation of trade secrets under the ITSA, the trial court's decision was based almost entirely on the misappropriation theory.[3] The issue on appeal is not whether Shatila and IFP breached a contractual duty of confidentiality to Basic, but whether the conduct of appellants amounted to misappropriation of a trade secret under the ITSA.

■■■ The trial court ruled that "misappropriation occurs when a defendant uses a plaintiff's trade secret as a 'starting point' for new formulations or processes," citing several cases, including *Head Ski Co. v. Kam Ski Co.*, 158 F.Supp. 919 (D.Md.1958). IFP and Shatila argue that the court erred in applying the "starting point" theory of misappropriation:

> [T]he 'starting point' analysis is not so much a legal theory, as it is a fact pattern analysis ... not unlike the 'unavoidable accident,' 'open and obvious danger' or 'last clear chance' doctrines that were once considered as separate legal doctrines, but are now to be recognized to be merely particular fact patterns to be resolved under general, not special liability rules.

It is unnecessary for purposes of this appeal, however, to determine whether the "starting point" is a separate legal test or merely a fact pattern analysis. The fact that Shatila used the process for manufacturing the Golden Grill product as the starting point for developing IFP's Real Hash Brown may be evidence of misappropriation. "A party may not use another's trade secret, even with independent improvements or modifications, so long as the product or process is substantially derived from the trade secret. If the law were not flexible enough to reach such modifications, trade secret protection would

be quite hollow." *American Can,* 742 F.2d at 328–29. In spite of this principle, the district court should still have applied the test for misappropriation as set forth in the ITSA, and erred by failing to do so.

The ITSA provides the following definition of misappropriation:

(2) "Misappropriation" means:

(a) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(b) Disclosure or use of a trade secret of another without express or implied consent by a person who:

(A) Used improper means to acquire knowledge of the trade secret; or

(B) At the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was:

(i) Derived from or through a person who had utilized improper means to acquire it;

(ii) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

(iii) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

(C) Before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

I.C. § 48–801(2). "Improper means" under the ITSA "include theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." I.C. § 48–801(1).

■■■ The district court's findings of fact, when applied to the correct test under the

---

**3.** The appellants argue that the interpretation of the consultation agreement is a matter of law that should be reviewed *de novo. See Terteling v. Payne,* 131 Idaho 389, 391–92, 957 P.2d 1387, 1389–90 (1998). Appellants also contend that the contract should be construed against the drafter. *See Stipp v. Wallace Plating, Inc.,* 96 Idaho 5, 6, 523 P.2d 822, 823 (1974). It is

unnecessary for this Court to interpret the contract, however, since the trial court's decision was based solely on Basic's ITSA misappropriation claim. The language of the contract is relevant only to the extent that it establishes that Shatila had a duty of secrecy, thus making his disclosure of the Trade Secret improper. *See* I.C. § 48–801(1).

ITSA, support the district court's final determination that Shatila and IFP were liable for misappropriation. The court found that Shatila was intimately involved in the development of the Golden Grill Hash Brown, and that under Shatila's guidance, IFP was able to develop a substantially identical product after only a few months of testing and experimentation. In light of the confidentiality provisions of the employment and consulting agreements between Basic and Shatila, the disclosure of the Trade Secret was "disclosure or use of a trade secret of another without express or implied consent" by a person who "[a]t the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was ... [a]cquired under circumstances giving rise to a duty to maintain its secrecy or limit its use...." *See* I.C. § 48–801(2)(b). This Court holds that when the district court's findings of fact are applied to the test as set forth under the ITSA, Shatila and IFP are liable for misappropriation.

Appellants argue that Shatila could not have misappropriated the Trade Secret because Shatila's consulting contract expressly granted permission to divulge information in the public domain. The contract, in pertinent part, reads:

> 5.01 Confidentiality. CONSULTANT shall not divulge or use in any manner any confidential information, or proprietary information *not in the public domain* concerning or relating to [Basic], or any division, subsidiary, parent or successor thereof, that may have been acquired while an employee of [Basic], or which may be acquired in the course of his employment under this Agreement. The provisions of this paragraph 5.01 shall survive the expiration or other termination of this Agreement.

(emphasis added). The appellants then argue that the individual elements of the Trade Secret summarized by the trial court were each in the public domain, and that Shatila had a contractual right to divulge each element of the Trade Secret.

These arguments are unpersuasive for three reasons. First, it attempts to break the Trade Secret as defined by the trial court into its individual elements, rather than analyze the process as a whole. As explained above, a protectable trade secret may consist of several individual elements which in and of themselves are readily ascertainable, but may be a trade secret when considered as a whole. *See, e.g., Rohm & Haas Co. v. Adco Chem. Co.*, 689 F.2d 424, 433 (3d Cir.1982); *Integrated Cash Management Serv., Inc. v. Digital Transactions, Inc.*, 920 F.2d 171, 174 (2d Cir.1990).

Second, the contract does not give permission to disclose proprietary information, but rather prohibits Shatila from disclosing information not in the public domain. Shatila was also bound by other employment agreements to keep Basic's proprietary information confidential. The 1964 employment agreement, for example, states:

> [A]ll such [proprietary] knowledge and information which EMPLOYEE now possesses, or shall hereafter acquire, concerning and pertaining to the business and secrets of EMPLOYER and all inventions or discoveries made or developed, or suggested by or to EMPLOYEE during said term of employment relating to EMPLOYER'S business shall, at all times and for all purposes, be regarded as acquired and held by EMPLOYEE in fiduciary capacity and solely for the benefit of EMPLOYER....

Shatila and Basic also entered into an "Employment Agreement Regarding Inventions and Secrecy" in 1968, which states:

> 6. Employee will not disclose or reveal to any person outside Company any secret or confidential information concerning any Company product, process, equipment, machinery, design, formula, business, or other activity without prior permission of Company in writing. The obligation to protect the secrecy of such information continues after employment with Company may be terminated.

In light of the consulting and employment agreements, Shatila was clearly required to honor the confidentiality of Basic's proprietary information.

Third, the argument is contrary to the trial court's factual determination that

there was a protectable trade secret. "Public domain" means "public ownership status of writings, documents, or publications that are not protected by copyrights." BLACK'S LAW DICTIONARY 1229 (6th ed.1990). The term has also been defined as "the realm embracing property rights belonging to the community at large, subject to appropriation by anyone." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1836 (1967). The term "public domain" is essentially analogous to "generally known" or "readily ascertainable" in the context of trade secrets law. "Information is readily ascertainable if it is available in trade journals, reference books, or published materials." Uniform Trade Secrets Act § 1, Commissioners Comment, 14 UNIFORM LAWS ANNOTATED 439 (1990). Therefore, if the process embodied in the Trade Secret were in the public domain, the process would not be a trade secret. The converse is also true: if information is held to be a trade secret, it cannot be in the public domain. Since this Court has held that a protectable trade secret existed, it also holds that the information was not in the public domain, and upholds the trial court's determination that Shatila and IFP misappropriated the Trade Secret.

**E. The Trial Court Did Not Err In Finding That Basic Had Established Any "Actual Loss" Under Idaho Code § 48–803.**

Appellants concede that Basic had produced evidence to support the unjust enrichment award of $675,388. Appellants argue, however, that Basic failed to establish "actual loss" caused by the misappropriation because the evidence the court used to support the amount of loss was inadmissible hearsay.

At trial, Basic called Gordon Lewis, Basic's Vice President of Marketing and Research, as an expert witness. Lewis gave opinion testimony concerning the lost profits and retention costs Basic suffered because of the misappropriation. Lewis based his opinion on his own conversations with Basic customers, as well as Plaintiff's Exhibit 167, a report prepared by Basic employee Roger Smith. Appellants objected to the admission of Lewis' testimony, arguing that it was

hearsay. Basic conceded that Exhibit 167 was hearsay and not admissible to establish the truth of the facts contained in the report, but argued Lewis was allowed to use the report as a basis for his expert opinion concerning IFP's competitive threats to Basic's business and Basic's reaction to those threats.

The court ruled that Lewis' opinion testimony was admissible, and that Lewis was allowed to refer to Exhibit 167, even though it was hearsay. The court noted:

> [I]t appears to me to be the kind of information that [Lewis] would rely upon in determining, one, what the extent of the competitive threat is, two, what kind of response might be made to that competitive threat; and allowing him to decide, in essence, what needs to be done, if anything.

The district court specifically recognized that "the inadmissible hearsay used by the expert may be admitted solely to illustrate and explain the expert's opinion," and that it would consider Lewis' testimony "in that light."

Appellants nevertheless argue that Basic used Lewis as "a mere conduit" for hearsay, and that the court erred in admitting the testimony. *See Keller Lorenz Co. v. Ins. Assoc. Corp.*, 98 Idaho 678, 684, 570 P.2d 1366, 1372 (1977). Appellants argue that Lewis' testimony was not based on his own independent judgment, but was merely the hearsay opinion of another Basic employee. Appellants also argue that Exhibit 167 was not the type of evidence that most experts would rely upon within the meaning of Idaho Rule of Evidence 703.

Trial courts have "broad discretion in the admission of evidence at trial, and [their] decision to admit such evidence will be reversed only when there has been a clear abuse of that discretion." *Empire Lumber Co. v. Thermal–Dynamic Towers, Inc.*, 132 Idaho 295, 304, 971 P.2d 1119, 1128 (1998). The same standard applies to the admission of expert testimony. *See id.* The decision to permit an expert to base his or her opinion on opinions or facts supplied by others is also governed by the trial court's discretion. *See Lanham v. Idaho Power Co.*, 130 Idaho 486,

494, 943 P.2d 912, 920 (1997). The determination of an expert's qualifications is likewise a discretionary matter. *See id.* There is no abuse of discretion where the trial court perceives the issue in question as discretionary, acts within the outer boundaries of its discretion and consistently with the legal standards applicable to the available choices, and reaches its decision through an exercise of reason. *See Sun Valley Shopping Center, Inc. v. Idaho Power Co.,* 119 Idaho 87, 94, 803 P.2d 993, 1000 (1991).

In its conclusions of law, the trial court explained its reasons for admitting Mr. Lewis' testimony:

If specialized knowledge will assist the trier of fact in understanding the evidence, "a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of opinion or otherwise." Rule 702, I.R.E. Lewis has approximately fifteen years of experience in identifying, evaluating and responding to competitive threats to Basic's business. Based on that experience, Lewis qualifies as an expert on competitive threats to Basic's business under Rule 702, I.R.E.

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible into evidence. Rule 703, I.R.E.

The Supreme Court of Idaho, in *Keller Lorenz Co., Inc. v. Ins. Assocs. Corp.,* 98 Idaho 678, 570 P.2d 1366 (1977), held that an appraiser, qualified as an expert witness, could base his opinion in part on the work of other appraisers, as long as the expert witness exercised his independent judgment when forming his opinion. The District Court of Appeals of Florida similarly ruled that an accountant, testifying as an expert witness, could base his opinion in part on data collected under his supervision by employees of his accounting firm. *Peninsula Federal Saving and Loan Association v. DKH Properties, Ltd.,* 616 So.2d 1070 (Fla.Dist.Ct.App.1993); *see also Marks v. Marks,* 576 So.2d 859 (Fla.Dist. Ct.App.1991) (stating that expert opinion is not inadmissible just because it is based on data prepared by the expert's subordinate). Experts are entitled to rely upon work performed by their employees in forming and expressing their own opinion.

In forming his opinion regarding Basic's damages, Lewis directed Smith's efforts to quantify those damages and reviewed Smith's work. Lewis also discussed Idahoan's competitive threat with Basic's sales representatives, was involved in negotiating a response to Idahoan's competitive threat to one of Basic's distributors, and was involved in investigating, analyzing and preparing a response to Idahoan's competitive threat to Sysco Foods, one of Basic's major customers.

Lewis was qualified to offer opinions regarding the evaluation of and damages resulting from Idahoan's competitive threat.

In admitting Lewis' testimony, the trial court recognized the question as discretionary, and applied appropriate legal standards.

 In light of the trial court's explanation, we hold that the trial court did not abuse its discretion in admitting the testimony. The district court determined that while Lewis based much of his opinion on Smith's report, he had also personally participated in the investigation and formed his opinion by the exercise of independent judgment. "The trial court, in its discretion, may allow an expert to render an opinion based in part upon hearsay or other inadmissible evidence, as long as the expert testifies as to the specific basis of his opinion and reaches an opinion through his own independent judgment." *Doty v. Bishara,* 123 Idaho 329, 336, 848 P.2d 387, 394 (1992). The appellants' arguments concerning the admission of Lewis' testimony fail because appellants have not shown that the trial court abused its discretion in determining that Lewis was a qualified expert and that Exhibit 167 contained the sort of information experts would rely upon in forming an opinion about the company's retention costs.

■ Shatila and IFP also argue that since Lewis' testimony was not admitted as substantive evidence, Basic failed to meet its burden of proving retention costs or lost profit damages. This argument is not persuasive; this Court has held that expert testimony is sufficient evidence for calculating an award of damages. *See Westfall v. Caterpillar, Inc.*, 120 Idaho 918, 921, 821 P.2d 973, 976 (1991). We conclude that the district court did not err in ruling that Basic proved economic loss from the misappropriation of the Trade Secret.

### F. IFP And Shatila Are Not Entitled To Attorney Fees On Appeal Or At Trial.

Since this Court upholds the trial court's ruling that the appellants Shatila and IFP misappropriated Basic's Trade Secret, the appellants are not the prevailing party and therefore are not entitled to attorneys fees.

### G. Whether The Trial Court Erred By Employing A "Net Profit" Measure To Calculate The Amount Of The Unjust Enrichment Award.

■ On cross-appeal, Basic argues that the trial court erred by employing a "net profit" measure of damages. A determination of the proper measure of damages is a question of law. *See Hossner v. Idaho Forest Indust., Inc.*, 122 Idaho 413, 415–16, 835 P.2d 648, 650–51 (1992) (characterizing proper measure of damages for timber conversion as an issue of law). Although the calculation of damages in a trade secret case is a factual determination, the formula used in making that calculation is a question of law. *See P.C. Films Corp. v. MGM/UA Video, Inc.*, 138 F.3d 453, 458 (1998). As stated above, this Court reviews issues of law *de novo*. *See The Highlands*, 130 Idaho at 69, 936 P.2d at 1311.

#### 1. Basic did not waive its right to cross-appeal by executing its judgment.

Appellants argued in a motion to dismiss Basic's cross-appeal, that Basic waived its right to appeal by executing and collecting the $3.26 million judgment entered by the trial court, citing *Bechtel v. Evans*, 10 Idaho 147, 149, 77 P. 212, 212–13 (1904). This Court denied the motion to dismiss subject to reconsideration of the dismissal after oral argument. Appellants renew their argument in defending Basic's cross-appeal.

■ The appellants' argument is not persuasive. The Court in *Bechtel* stated: "It seems to us, as a general proposition of law, that a successful party should not be allowed to gather in and enjoy the fruits of his judgment and thereafter prosecute an appeal and complain of error committed against him." 10 Idaho at 149, 77 P. 212–13. The Court then set forth the test governing the application of this general proposition:

> Upon reason and principle, however, it appears to us that the test should be this: If the party has collected his judgment, and in seeking to gain more by the prosecution of an appeal *thereby incurs the hazard of eventually recovering less*, then his appeal should be dismissed. If, on the other hand, the appeal is from such an order or judgment as that he *could in no event recover a less favorable judgment* and that he incurs no hazard of ever receiving less than the judgment already collected by him, we see no objection to the prosecution of his appeal.

*Id.* at 150, 77 P. at 213. The reasoning behind the *Bechtel* rule, therefore, is grounded on preventing a plaintiff from prosecuting an appeal which, if successful, might result in a reduced recovery. The United States Supreme Court has reached the same conclusion: "It is a generally accepted rule of law that where a judgment is appealed on the ground that the damages awarded are inadequate, acceptance of payment of the amount of the unsatisfactory judgment does not, standing alone, amount to an accord and satisfaction of the entire claim." *United States v. Hougham*, 364 U.S. 310, 312, 81 S.Ct. 13, 16, 5 L.Ed.2d 8, 12 (1960). Since Basic's cross-appeal, if successful, will not result in a reduced recovery, Basic has not waived its right to its cross-appeal under the *Bechtel* rule.

#### 2. The district court did not err in applying its "net profit" measure of damages.

■ Basic argues that the district court erred by concluding that the appropriate

measure of unjust enrichment was IFP's gross sales, less "associated costs." The district court included "Other operating expense" as one element of associated costs. This "other operating expense" included a percentage of IFP's "general and administrative expenses," which represented the amount of general expenses attributable to the production of the Idahoan Real Hash Brown. The percentage used was equivalent to the Idahoan Real Hash Brown's percentage of IFP's total sales. The court ruled that there was a direct relationship between IFP's claimed general and administrative expenses for the Real Hash Brown and administrative expenses actually attributable to the Real Hash brown.

Basic argues that this measure of damages was inadequate because it allowed IFP to retain some of its misappropriated gain by improperly offsetting general expenses. Basic cites the Restatement of Torts § 748, comment I, which states:

> Apportionment of Costs. If the defendant manufactures several kinds of products and is subject to liability to the plaintiff for conduct with reference to only one of them, there may be considerable difficulty in apportioning the defendant's costs between that product and the others.... The problem with apportionment arises only with reference to joint expenses, that is, expenses incurred in connection with several kinds of goods jointly.... [T]he accounting for profits seeks to determine as *accurately as possible* what part of the joint expenses was incurred in the manufacture or marketing of the infringing goods and what part would have been incurred if the infringing goods had not been manufactured or marketed.

(emphasis added). Basic also cites *USM Corp. v. Marson Fastener Corp.*, in which the Supreme Court of Massachusetts stated:

> Once a plaintiff demonstrates that a defendant made a profit from the sale of products produced by improper use of a trade secret, the burden shifts to the defendant to demonstrate those costs properly to be offset against its profit and the portion of the profit attributable to factors other than the trade secret. If a defendant cannot meet its burden as to costs and profits, the defendant must suffer the consequences. The over-all object is to render "the ultimate recovery a sound reflection of [the defendants'] unjust enrichment due to the exploitation of the secret and no more."

392 Mass. 334, 467 N.E.2d 1271, 1276 (1984) (citations omitted). Basic argues that IFP failed to prove that the percentage of general expenses it allocated to the production of the Idahoan Real Hash Brown were directly related to the offending product.

Basic's argument fails because the trial court was persuaded that there was a direct relationship between IFP's claimed general and administrative expenses for the Real Hash Brown and administrative expenses actually attributable to the Real Hash Brown. The trial court applied the correct measure of IFP's profits: the gross sales from the Real Hash Brown, less the expense attributable to the production of the offending product. The court found that the percentage allocation of IFP's general expenses was directly related to the actual expenses for producing the Real Hash Brown, and calculated the damages accordingly. Such factual findings are not overturned unless clearly erroneous. *See The Highlands*, 130 Idaho at 69, 936 P.2d at 1311. Since Basic has not shown that this was clearly erroneous, we conclude that the district court did not err calculating Basic's damages.

## V.

## CONCLUSION

We find that when the facts as found by the trial court are applied to the correct tests under the ITSA, IFP and Shatila are liable for misappropriation of Basic's Trade Secret. We also hold that the district court did not err in ruling that Basic had established "actual loss." We also hold that the district court did not err in applying its measure of "net profit" in measuring Basic's unjust enrichment award. Because of the mixed result, no fees or costs are awarded to either party.

Chief Justice TROUT, Justices SCHROEDER, WALTERS and KIDWELL concur.