IN THE SUPREME COURT OF THE STATE OF IDAHO
Docket No. 35732

| | | |
|---|---|---|
| WESCO AUTOBODY SUPPLY, INC., a Washington corporation, | ) ) ) | |
| Plaintiff-Appellant-Cross Respondent, | ) ) | |
| v. | ) ) | Boise, February 2010 Term |
| HOLLY ERNEST, individually; PAINT AND SPRAY SUPPLY, INC., an Idaho corporation; AUTOMOTIVE PAINT WAREHOUSE, a Utah corporation; HUGH BARKDULL, individually; BRADY BARKDULL, individually; and MIKE COOK, individually, | ) ) ) ) ) ) ) ) ) | 2010 Opinion No. 91 Filed: July 28, 2010 Stephen W. Kenyon, Clerk |
| Defendants-Respondents-Cross Appellants. | ) ) ) | |

Appeal from the District Court of the Sixth Judicial District, State of Idaho, Bannock County. Hon. Don L. Harding, District Judge.

District court order granting partial summary judgment, <u>affirmed</u> in part and <u>remanded</u> for further proceedings.

Givens Pursley, LLP, Boise and Davis Wright Tremaine, LLP, Seattle, for appellant. Alan Middleton, Seattle, argued.

Merrill & Merrill, Pocatello, for respondent. Kent L. Hawkins argued.

_____

BURDICK, Justice

This case arises out of the purchase by Appellant Wesco Autobody Supply, Inc. (Wesco) of three auto body supply stores from Paint & Equipment Supply, Inc. (P&E) on August 1, 2005. The stores were located in Idaho Falls, Pocatello, and Twin Falls, Idaho (Idaho Stores). Respondents Holly Ernest (Ernest) and Tom Davis (Davis) were owners of Automotive Paint Warehouse (APW), a wholesale supplier to the three stores, and Paint & Spray Supply, Inc. (P&S), an Idaho corporation that owned supply stores in the Boise area. Respondents Brady Barkdull (Brady), Hugh Barkdull (Hugh), and Mike Cook (Cook) were employees in the Idaho

Stores at the time of Wesco's purchase. (Ernest, Davis, Brady, Hugh, and Cook are collectively referred to as "Respondents"). On August 19, 2005, the majority of Wesco employees from the Idaho Stores quit and began working for P&S. Wesco commenced this suit against Ernest, Davis, P&S, APW, and the departing employees (collectively "Defendants").

Wesco raises the following issues on appeal: (1) whether the district court erred in granting summary judgment; (2) whether the district court erred in holding as a matter of law that Ernest, Davis, P&S, and APW are not liable for tortious interference with Wesco's employment and customer contracts and prospective business advantage; (3) whether the district court erred in narrowing the acts as a matter of law for which Brady is potentially liable; and (4) whether the district court erred by finding as a matter of law that Defendants are not liable for civil conspiracy. On cross-appeal, Respondents raise the issue of whether the district court erred in failing to grant Defendants' renewed motion for summary judgment. We affirm, in part, and remand for further proceedings.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Wesco is a Washington corporation that owns stores in Washington, Oregon, and Idaho. On August 1, 2005, Wesco purchased the Idaho Stores from P&E for $2.2 million. Of that purchase price, $996,000 was allocated to the purchase of the goodwill associated with the Idaho Stores. Defendants Jeffrey Peck, Travis Dayley, Joel Johnston, Chantil Dobbs, David Cristobal, Ryan Nesmith, Jodee Reid, Curtis Stairs, Tiffany Thomsen, Hugh Barkdull, Brady Barkdull, Michael Cook, Shelby Thompson, Jenny Hancock, and Kelly McClure were all employed by P&E at the time of the purchase.

When Wesco purchased the Idaho Stores, Brady was the regional sales manager for the Idaho Stores; Hugh was the manager of outside sales; Cook was the manager of the Pocatello store; Hancock was the manager of the Idaho Falls store; Dayley was the manager of the Twin Falls store along with handling some outside sales; and Peck was the manager of outside sales at the Twin Falls store.

Ernest and Davis are the owners of APW and P&S. When Wesco purchased the Idaho Stores from P&E, APW was the wholesale paint supplier to P&E. Wesco alleged that, prior to Wesco's purchase of P&E, Ernest and Davis informed Roger Howe, a Wesco owner, that they knew P&E's employees very well, had a better relationship with them than P&E's owner, and if

P&E did not work something out with them, they would take the business from P&E's owner. Howe's testimony was as follows:

> Q. And what was the nature of that conversation?
>
> A. Just essentially that they were, you know, interested in the three stores down there and if anything ever become of it, you know, they'd like to do something with the stores down there and that sort of thing.
>
> Q. Anything else you recall about that conversation today?
>
> A. Yeah, that they had a better handle of David's [P&E's owner] business. They knew his employees real well, and they had a better relationship with them than David did and that—you know, I mean, if they couldn't work something out with David, they'd just go take it away from him.
>
> Q. Is that a quote, or is that just your recollection today?
>
> A. That's my reco—it's not an exact quote, but it's a pretty—pretty fair statement of what I recall.

After the purchase of P&E, on August 8 and 9, 2005, Brady traveled to Seattle, Washington for an orientation meeting with Wesco. There, he learned that Wesco would no longer purchase APW paint at the Idaho Stores. Instead, Wesco would be supplying the Idaho Stores from Wesco's Washington warehouses. On or about August 10, 2005,[1] Brady met with Ernest and Davis. While Brady stated at his deposition that Ernest told Brady he was opening stores in Idaho and asked if he would be interested in accepting a position, Ernest stated in his deposition that he did not offer Brady a job until August 13 and that Brady informed him at the August 10 meeting that APW was going to lose its account with P&E/Wesco. Davis stated that he believed they did offer Brady a job at the August 10 meeting. It is not disputed that Ernest and Davis decided at some time prior to August 19, 2005, to open stores that would compete with Wesco's newly acquired Idaho Stores.

On August 13, 2005, Brady met with Ernest to look at potential store sites in Pocatello. Ernest stated that he took Brady along to try to convince Brady to come work for P&S. Brady told Ernest that if the other employees went he would probably go also, but Ernest said Brady did not offer to solicit any of the employees. Brady did make calls to High Desert Realty on August 17 and 19, 2005, to assist P&S in locating a retail location. Brady also admitted that he placed

---

[1] Brady stated that the date of the meeting was August 11, 2005. Ernest stated that the date of the meeting was either the 9th or 10th of August. Davis said the meeting was "probably closer to the 12th" of August.

calls on August 16, 2005, inquiring about obtaining business licenses for P&S. Between August 10 and August 19, 2005, Brady and Ernest exchanged 64 telephone calls.

On August 17, 2005, Ernest met with Cook and Hancock to offer them jobs working for P&S. Brady was present at the meeting with Hancock. On the same date, Howe and Mark Mortensen, a Wesco employee, met in Pocatello with Brady, Hugh, and Cook to discuss rumors that employees were leaving to work for a competitor. All three denied the rumors, according to Howe.

The next day, on August 18, 2005, Ernest met with Dayley, Cristobal, and Johnston to offer them jobs at P&S. Brady stated that he discussed the resignations with Peck and Dayley. Hancock also spoke with Thompson and McClure about their decisions to work for P&S. Hancock stated that Brady told her they would all be quitting on Friday afternoon.

On August 19, 2005, the employees submitted their resignations to Wesco at the end of the day. The resignation letters contained nearly identical language.[2] Hancock prepared the letter for the Idaho Falls office. Cook prepared the letter for the Pocatello office and told others they could use it if they wanted to. Cook pointed Dayley to a website that he could use to draft a resignation letter, and Dayley was asked by the other Twin Falls employees to draft letters for them as well.

When Cristobal and Johnston left their employment with Wesco, they took two interior paint books with them (Cristobal returned one of the paint books). Johnston testified that the "SEM book" has color information for matching up interior dyes and that the book he took was one he had requested from the SEM representative for himself. Johnston also stated that he took the business cards that customers and businesses had given him over his years at P&E. Cook admitted that he deleted his work folder, two personal programs he had brought in (Adobe Photo Shop and Microsoft Office), customer phone lists that had been saved in Microsoft Excel, letters to customers that had been saved in Microsoft Word, and his music folder. Wesco hired Wes Goodwin, from a data services company, to search a hard drive for evidence of inappropriate

---

[2] Many of the letters stated:
> Dear Wesco Group:
> Please accept this letter of resignation, effective 8/19/05. My decision to leave Wesco is in no way related to any negative experiences.
> I have been given an opportunity to enhance my career and gain new challenges and experiences.
> I am confident in my decision and hope you can understand.

usage by the former employees. Goodwin concluded that there was a significant indication of deleted and damaged files that appeared to be associated with Wesco operations as well as the computer operating system, and that the files were not deleted during the normal course of the computer operation.

At some point letters were sent to customers from some of the former employees regarding P&S's new business and its locations. The letters were undated but stated that "[e]ffective August 19, 2005…" the employees had terminated employment with P&E and would be joining P&S as of August 22, 2005. A letter dated August 16, 2005, was also sent to customers from P&S and included Brady as one of its "people."

Wesco alleged that the employees continued to use their Wesco cell phones and cell numbers and, as late as August 25, 2005, some of the employees' phones still gave an introduction with the P&E name. Wesco also alleged that the employees continued to wear P&E shirts at the new stores. Dayley stated that he told some customers about the lawsuit with Wesco, but did not make any other representations about Wesco outside of that. Peck also stated that on August 20, 2005, he contacted customer "Marky's Autobody" to tell it he would be working for P&S.

Former Wesco employees Curtis Stairs, Tiffany Thomsen, David Cristobal, Chantil Dobbs, Travis Dayley, Jeffrey Peck, Joel Johnston, Kelly McClure, Shelby Thompson, Jenny Hancock, Brady Barkdull, Hugh Barkdull, Michael Cook, and Jodee Reid filed affidavits in March 2006, that were substantially similar to the following:

1. That I have personal knowledge of the facts stated herein.

2. That prior to August 19, 2005 I was an employee of Wesco Autobody Supply, Inc., dba Paint and Equipment Supply in Pocatello[, Twin Falls, Idaho Falls], Idaho. I had become an employee of Wesco when Paint and Equipment Supply, Inc. had been purchased by Wesco on or about August 1, 2005.

3. That as an employee of Wesco I had not entered into any employment contract which limited the time I was to work for them, when or under what circumstances I could leave, who I could go to work for, or what information I could share with a new employer. I was specifically designated by Wesco as an "at will" employee.

4. That I terminated my employment with Wesco on or about August 19, 2005 and went to work for Paint and Spray Supply, Inc. on or about August 22, 2005.

5. When I left my employment with Wesco, I took with me only my personal belongings. I specifically did not take any employee lists, customer lists,

5

customer information (such as custom paint formulas), or any other business information or documents belonging to Wesco. I did not download or forward by computer any such information of any kind. I did not remove any computer or delete or corrupt any computer files of any kind.

6. Since going to work for Paint and Spray Supply, Inc. I have not said anything of a disparaging nature about Wesco to any former or current Wesco customer, I have not told any former or current Wesco customer that they did not have to comply with any contracts they may have with Wesco, and I have not interfered with any relationship Wesco may have or may have had with any current or former customer other than to compete for the business that customer may have for automobile paint and related supplies offered for sale by Paint and Supply.

Dayley's affidavit differed in that it added a declaration "[t]hat Ryan Nesmith terminated his employment with Wesco prior to August 19, 2005, does not and has never worked for Paint and Spray Supply and had nothing to do with any opening of Paint & Spray Supply stores." McClure's affidavit stated that McClure terminated employment with Wesco on or about August 20, 2005. Thompson's affidavit stated that she terminated her employment with Wesco on or about August 29, 2005, and went to work for P&S on or about August 30, 2005. Cook's affidavit also stated:

I did delete a personal work folder and two computer programs that were my personal programs (Microsoft Office and Adobe) and that I had loaded on one of the Wesco computers to assist me with my personal work and for personal matters. This included the deletion of my personal customer telephone list. All other customer information remained on the computer, including location, telephone number, sales information, etc.

The affidavit of Ernest read as follows:

1. I am one of the owners of Automotive Paint Warehouse (APW), a Utah corporation, and also of Paint and Spray Supply, Inc. (P&S), which is a separate corporation from APW. Individually, and in the capacities mentioned above, I have personal knowledge of the facts stated herein.

2. P&S is an Idaho corporation that has been in good standing since about 1972 and has been selling automotive paint and supply products in Idaho during that time. APW and P&S have an agreement with BASF to sell BASF products in Idaho and APW charges P&S the same price for its products as it charged Wesco and P&E prior to the time P&S opened its stores in August 2005. APW is a wholesaler in Idaho and does not compete with Wesco for retail business.

3. I had telephone and personal contacts with some of the employees of Wesco Autobody Supply, Inc. (Wesco), on or after August 10, 2005, for the purpose of attempting to hire some individuals to go to work in stores that were being opened in Pocatello, Twin Falls, and Idaho Falls, Idaho by P&S. Any such contacts were

6

made on behalf of and in my capacity as an owner of P&S and were not made in a personal capacity or as an owner of APW.

4. On or after August 22, 2005, P&S opened automotive paint and supply stores in Pocatello, Twin Falls, and Idaho Falls, Idaho. Those stores are wholly owned and operated by P&S and have nothing to do with APW, other than as a customer of APW.

5. At no time have I, personally or as an owner of P&S, nor has P&S had any intent or desire to drive Wesco out of business, but the sole desire has been to legitimately compete in the business of selling automotive paint and supplies to potential customers in the markets served by the P&S stores in Idaho, as was the case prior to Wesco's purchase of P&E.

Wesco brought this action against its former employees and Ernest, Davis, P&S, and APW, asserting nine theories of liability and seeking a temporary restraining order:[3] (1) interference with prospective economic advantage; (2) breach of contract/breach of duties; (3) interference with contract as to Ernest, Davis, P&S, and APW; (4) interference with contract as to all Defendants; (5) unfair competition; (6) restraint of commerce in contravention of the Idaho Competition Act; (7) computer fraud in contravention of 18 U.S.C. § 1030; (8) misappropriation of trade secrets in contravention of the Idaho Trade Secrets Act; and (9) civil conspiracy. In its First Amended Complaint,[4] Wesco added a claim for conversion against all Defendants. The district court's Decision Re: Summary Judgment, entered on September 7, 2006, decided the claims raised by Wesco as follows:

  (1) Count One: Interference with Prospective Economic Advantage (All Defendants)

    (a) Dismissed except as to employees Dayley, Johnston, Brady, Cook, and Hancock

  (2) Count Two: Breach of Contract/Breach of Duties (Employees)

---

[3] The temporary restraining order was granted, in part, on September 12, 2005, and is not an issue on this appeal.

[4] Wesco's motion to amend the complaint was seemingly granted during the July 10, 2006, hearing on the motion for summary judgment, and the district court used the amended complaint in its Decision Re: Summary Judgment. At the July 10, 2006, hearing on the motion for summary judgment, counsel for Defendants stated in regard to the amended complaint: "I've gone through that and discussed it with my clients. I agree, for the most part, those are housekeeping issues. My review of it didn't affect my motion for summary judgment, other than the conversion thing I haven't had a chance to respond to, as far as making a motion for summary judgement [sic] on the conversion." However, the complaint was not filed until February 2, 2007. The amended complaint did not contain Wesco's claim for a temporary restraining order and preliminary injunction, which had been previously granted in part by the district court. The amended complaint also added the conversion claim. However, the defendants did not move for summary judgment on the conversion claim, due to the timing of the filing of the amended complaint. That issue will be addressed in the context of the conversion claim below. Because Defendants stated that the amended complaint did not affect the motion for summary judgment and is the substantially the same as the original complaint, we will use the First Amended Complaint in this Court's discussion as well.

7

(a) Covenant of Good Faith and Fair Dealing—Dismissed as to all

(b) Fiduciary Duty—Dismissed except as to Dayley, Johnston, Brady, Cook, and Hancock

(3) Count Three: Interference with Contract[5] (Ernest, Davis, P&S and Automotive)

(a) Dismissed as to all

(4) Count Four: Interference with Contract[6] (All Defendants)

(a) Dismissed as to all

(5) Count Five: Unfair Competition (All Defendants)

(a) Dismissed as to Ernest & APW, but not to all employees and P&S

(6) Count Six: Idaho Competition Act (All Defendants)

(a) Dismissed as to all

(7) Count Seven: 18 U.S.C. § 1030 (Employees)

(a) Dismissed as to all Defendants except Cook

(8) Count Eight: Idaho Trade Secrets Act (All Defendants)

(a) Dismissed as to all except Cook

(9) Count Nine: Civil Conspiracy (All Defendants)

(a) Dismissed as to all

(10) Count Ten: Conversion (All Defendants)

(a) Defendants did not move for summary judgment as to this cause of action, but the court found there could only be a genuine issue of fact as to Cook, Johnston, and Cristobal

The district court denied Wesco's motion for reconsideration on November 11, 2006. Judge Don Harding was substituted for Judge Randy Smith on April 16, 2007. On January 11, 2008, the parties stipulated to the dismissal from the action with prejudice as to Jeffrey Peck, Travis Dayley, Joel Johnston, Chantil Dobbs, David Cristobal, Ryan Nesmith, Jodee Reid, Curtis Stairs, Tiffany Thomsen, Shelby Thompson, Jenny Hancock, and Kelly R. McClure. On January 30, 2008, the court issued its Memorandum Decision and Order on Motion to Reconsider denying Wesco's second motion for reconsideration. A renewed motion for complete summary judgment was filed by the remaining Defendants, and the court denied that motion on August 13,

---

[5] Count Three alleged that Ernest, Davis, P&S, and Automotive intentionally interfered with Wesco's *employee* contracts.

[6] Count Four focused on Defendants' interference with *customer* contracts.

8

2008. On September 10, 2008, the district court certified the September 7, 2006, order on summary judgment as "final" pursuant to Rule 54(b). The appeal was timely filed.

## II. ANALYSIS

### B. The district court did not err in granting partial summary judgment.

#### 1. Standard of review

When reviewing a ruling on a summary judgment motion, this Court applies the same standard used by the district court. *Van v. Portneuf Med. Ctr.*, 147 Idaho 552, 556, 212 P.3d 982, 986 (2009). Summary judgment is appropriate "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." I.R.C.P. 56(c). The burden of establishing the absence of a genuine issue of material fact is on the moving party. *Van*, 147 Idaho at 556, 212 P.3d at 986.

This Court will construe the record in the light most favorable to the party opposing the motion for summary judgment, drawing all reasonable inferences in that party's favor. *Id*. Summary judgment is improper "if reasonable persons could reach differing conclusions or draw conflicting inferences from the evidence presented." *McPheters v. Maile*, 138 Idaho 391, 394, 64 P.3d 317, 320 (2003). However, a "mere scintilla of evidence or only slight doubt as to the facts is not sufficient to create a genuine issue of material fact for the purposes of summary judgment." *Van*, 147 Idaho at 556, 212 P.3d at 986.

Wesco first argues that the district court erred in granting partial summary judgment on its claims. This issue encompasses Wesco's other issues raised on appeal and thus all issues will be discussed in the context of whether the district court erred in granting partial summary judgment. We will address each original count and decision by the district court in turn. On their cross-appeal, Respondents argue that the district court erred in failing to grant full summary judgment.[7] However, "an order denying a motion for summary judgment is neither a final order that can be directly appealed nor is it an order that can be reviewed on an appeal from a final judgment in the action." *Courtney v. Big O Tires*, 139 Idaho 821, 823, 87 P.3d 930, 932 (2003). Consequently, we will not review the denial of Respondents' request for full summary judgment.

---

[7] Respondents also cross-appeal from the Memorandum Decision and Order Denying Renewed Motion for Summary Judgment entered on August 13, 2008. However, that decision was not certified as a final and appealable judgment pursuant to Rule 54(b).

9

## 2. Breach of Contract

In its First Amended Complaint, Wesco asserts: (1) the employees had an employment contract with Wesco; (2) implied in every contract is the duty to act in good faith; (3) the employees owed a duty of fidelity, confidentiality, and loyalty to Wesco; and (4) by taking confidential customer information, soliciting customers for their new business while still employed by Wesco, and recruiting their fellow employees to work for P&S and APW, the employees materially breached their duties to Wesco.

It is settled law in Idaho that employment is at will unless an employee is hired pursuant to a contract that specifies the duration of employment or limits the reasons for which an employee may be discharged. *Jenkins v. Boise Cascade Corp.*, 141 Idaho 233, 240, 108 P.3d 380, 387 (2005). Thus, in the absence of an agreement limiting a party's right to terminate the employment relationship, they may terminate it at any time or for any reason. *Mitchell v. Zilog, Inc.*, 125 Idaho 709, 712, 874 P.2d 520, 523 (1994). "This rule reflects the judiciary's reluctance to bind employers and employees to an unsatisfactory and potentially costly situation, although we recognize that either party is likely to be damaged by an unforewarned termination of the employment relationship." *Id.*

There is no dispute that the employees here were at-will employees. Howe, an owner of Wesco, stated in his deposition that the employees could leave the employment of Wesco and go work for a competitor the next day based upon the employee agreements they signed with Wesco. The employee agreements stated:

> I, the undersigned, hereby acknowledge that my employment with Wesco Autobody Supply, Inc., is employment-at-will under the laws of the State of Idaho. Idaho State recognizes the doctrine of employment-at-will which means that either party to the relationship can terminate the employment with or without notice and with or without cause by either party. I further acknowledge my employment with Wesco Autobody Supply, Inc., will remain employment-at-will notwithstanding any other oral or written statement made by the company prior to, at or following my date of employment.

Included with the acknowledgment form was a document further defining "Employment-At-Will," which stated that "[e]mployees may resign from the company after proper notice and may be terminated by the company at any time, for any reason, with or without notice."

Here, the district court found that, because the employees were at-will, they could terminate their employment at any time and for any reason without breaching their employment contracts. We agree and find that the district court did not err in its determination that the

10

employees did not breach their employment contracts by terminating their employment with Wesco. However, we still must consider whether the employees breached the covenant of good faith and fair dealing or their fiduciary duties toward Wesco.

### a. Breach of covenant of good faith and fair dealing

"Idaho law recognizes a cause of action for breach of an implied covenant of good faith and fair dealing. Such a covenant is found in all employment agreements, including employment at-will relationships." *Cantwell v. City of Boise*, 146 Idaho 127, 135, 191 P.3d 205, 213 (2008) (internal citation omitted). The determination of whether the covenant has been breached is an objective determination of whether the parties have acted in good faith in terms of enforcing the contractual provisions. *Jenkins*, 141 Idaho at 243, 108 P.3d at 390. "An action by one party that violates, qualifies or significantly impairs any benefit or right of the other party under an employment contract whether express or implied, violates the covenant." *Cantwell*, 146 Idaho at 135-36, 191 P.3d at 213-14. However, the "covenant only arises in connection with the terms agreed to by the parties, and does not create new duties that are not inherent in the employment agreement." *Van v. Portneuf Med. Ctr.*, 147 Idaho 552, 562, 212 P.3d 982, 992 (2009).

The district court here found that a covenant of good faith and fair dealing arises only regarding terms agreed to by the parties, and there was no evidence in the record that the employment agreements between the parties included any terms regarding confidential customer information, soliciting Wesco's customers for other entities after leaving Wesco employment, and/or recruiting or talking to fellow employees about changing their employment. The district court, therefore, determined that the employees did not breach the covenant of good faith and fair dealing. This Court agrees that a material issue of fact was not raised as to whether Defendants breached the covenant of good faith and fair dealing. As the district court stated, there was no evidence of terms or provisions regarding confidentiality, solicitation, or recruitment in any agreement between Wesco and Defendants.

### b. Breach of fiduciary duty

"To establish a claim for breach of fiduciary duty, plaintiff must establish that defendants owed plaintiff a fiduciary duty and that the fiduciary duty was breached." *Tolley v. THI Co.*, 140 Idaho 253, 261, 92 P.3d 503, 511 (2004). This Court, in *Jensen v. Sidney Stevens Implement Co.*, approved of the following statements regarding fiduciary duty:

"Loyalty to his trust is the first duty which an agent owes to his principal. It follows as a necessary conclusion that the agent must not put himself in such a relationship that his interests become antagonistic to those of his principal. Fidelity in the agent is what is aimed at, and as a means of securing it the law will not permit the agent to place himself in a situation in which he may be tempted by his own private interest to disregard that of his principal. . . ."

36 Idaho 348, 353, 210 P. 1003, 1005 (1922). The Restatement (Third) of Agency § 8.04[8] states that:

Throughout the duration of an agency relationship, an agent has a duty to refrain from competing with the principal and from taking action on behalf of or otherwise assisting the principal's competitors. During that time, an agent may take action, not otherwise wrongful, to prepare for competition following termination of the agency relationship.

In *R Homes Corp. v. Herr*, the Idaho Court of Appeals addressed the issue of fiduciary duty in the context of the solicitation of customers. 142 Idaho 87, 123 P.3d 720 (Ct. App. 2005). The *Herr* Court found no evidence in the record that the defendant sought out customers or solicited customers before he terminated his employment with the plaintiff, and also held that it was unreasonable to infer solicitation had taken place solely from the fact that customers who once did business with the plaintiff thereafter did business with the defendant's new place of work. *Id.* at 90-91, 123 P.3d at 723-24.

Here, the district court found as follows:

[T]here are genuine issues of fact as to whether some of the employees (against whom Wesco has brought suit) have breached these duties. Dayley may have breached a duty by drafting letters of resignation for other employees. Johnston may have breached a duty by speaking to Dobbs about quitting P&E. Brady may have breached a duty by talking to other employees about quitting P&E. Cook may have breached a duty by writing resignation letters for other employees. Hancock may have breached a duty by speaking to Thompson and McClure about quitting P&E and by preparing resignation letters for them. The Court therefore dismisses all employee defendants except Dayley, Johnston, Brady, Cook, and Hancock as to this count.

We find that the district court did not err in its determination that a genuine issue of material fact exists as to whether Dayley, Johnston, Brady, Cook, and Hancock breached their fiduciary duties to Wesco. The district court is correct in finding that the deposition testimony of Dayley, Johnston, Brady, Cook, and Hancock indicates that, by drafting letters of resignation for

_____

[8] The district court referred to Restatement (Second) of Agency § 393 in its opinion. That section is adopted in large part by Restatement (Third) of Agency § 8.04.

12

other employees and speaking to other employees about quitting, those five employees may have put themselves in such a position that their interests became antagonistic to those of their principal or that they may have been assisting the principal's competitors.  In addition,  unlike in *R Homes*, the letters written to customers here provide evidence that the defendants may have sought out customers or solicited customers before the termination of their employment with Wesco.  The letters have contact information for Peck, Dayley, Brady, Johnston, Cristobal, Hancock, McClure, and Cook, and are not dated.  However, they state that the employees have terminated their employment with P&E effective August 19, 2005, and beginning August 22, 2005, have joined P&S.  It is difficult to tell when the letters may have been sent, so the evidence is tenuous, but the district court should consider it.  Therefore, as Dayley, Johnston, Hancock, Peck, Cristobal, and McClure were dismissed from the action by stipulation, we hold that a genuine issue of material fact exists as to whether Brady and Cook breached their fiduciary duties to Wesco.

Wesco also argues on appeal that Ernest and P&S actually participated in the employees' breach of their fiduciary duties by aiding and abetting the employees.  However, the claim for breach of contract and breach of duty on behalf of Ernest and P&S was not argued before the district court.  Thus, we need not address this claim on appeal as to aiding and abetting; however, the claim will be addressed in the context of the claim of tortious interference with contract.

### 3.  Interference with Prospective Economic Advantage[9]

In its First Amended Complaint, Wesco argues that Wesco had a valid economic expectancy in its relationship with its employees and customers in the Idaho Stores, Defendants had knowledge of that expectancy, and yet Defendants intentionally interfered with both Wesco's customer and employee relationships.  Furthermore, Wesco argued that Defendants interfered for the purpose of stealing Wesco's customers and putting the Idaho Stores out of business, and coercing Wesco's employees to leave Wesco's employ and work for P&S.  On appeal, Wesco argues that Ernest, Davis, and P&S employed wrongful means in aiding and abetting Brady's breach of his duty of loyalty and therefore tortiously interfered with Wesco's expectancy in the continuing employment and loyalty of its workforce.

---

[9] "This Court has previously noted that the torts of intentional interference with prospective economic advantage and intentional interference with contract are similar, and that cases and commentary addressing the two torts often apply interchangeably for proving the common elements."  *Cantwell v. City of Boise*, 146 Idaho 127, 138 n. 5, 191 P.3d 205, 216 n. 5 (2008).

To establish a claim for intentional interference with a prospective economic advantage, Wesco must show:

> (1) the existence of a valid economic expectancy, (2) knowledge of the expectancy on the part of the interferer, (3) intentional interference inducing termination of the expectancy, (4) the interference was wrongful by some measure beyond the fact of the interference itself, and (5) resulting damage to the plaintiff whose expectancy has been disrupted.

*Cantwell*, 146 Idaho at 138, 191 P.3d at 216. To establish that the intentional interference resulting in injury was wrongful, Wesco may offer proof that either: "(1) the defendant had an improper objective or purpose to harm the plaintiff; or (2) the defendant used a wrongful means to cause injury to the prospective business relationship." *Idaho First Nat'l Bank v. Bliss Valley Foods, Inc.*, 121 Idaho 266, 286, 824 P.2d 841, 861 (1991). However, an enforceable contract need not be shown to exist, just a valid economic expectancy. *Commercial Ventures, Inc. v. Rex M. & Lynn Lea Family Trust*, 145 Idaho 208, 217, 177 P.3d 955, 964 (2008).

In *Highland Enters., Inc. v. Barker*, this Court stated that the proper standard for the "knowledge of the expectancy" element necessary to make a claim of intentional interference with economic advantage is not actual knowledge. 133 Idaho 330, 338, 986 P.2d 996, 1004 (1999). Instead, the knowledge element may be "'satisfied by actual knowledge of the prospective [economic advantage] or by *knowledge "of facts which would lead a reasonable person to believe that such interest exists."*'" *Id.* at 338-39, 986 P.2d at 1004-05 (alteration and emphasis in the original) (quoting *Kutcher v. Zimmerman*, 957 P.2d 1076, 1088 n. 16 (Haw. Ct. App. 1998)).

Intent may be demonstrated if it is shown that the actor desires to bring about the interference, or "knows that the interference is certain or substantially certain to occur as a result of his action." *Id.* at 340, 986 P.2d at 1006 (quoting Restatement (Second) of Torts § 766 cmt. d (1977)). "Intent can be shown even if the interference is incidental to the actor's intended purpose and desire 'but known to him to be a necessary consequence of his action.'" *Id.* (quoting Restatement (Second) of Torts § 766 cmt. j. (1977)).

The district court here found that, given that it had found that some of the defendants (Dayley, Johnston, Brady, Cook, and Hancock) may have violated their fiduciary duty to Wesco, such a violation may also be wrongful conduct by some measure above the interference itself so as to support Wesco's claim for interference with prospective economic advantage. We affirm the district court in its finding that a genuine issue exists as to whether the violation of the

14

employees' fiduciary duty may also support Wesco's claim for interference with prospective economic advantage.

We also affirm the district court in its finding that a genuine issue of material fact does not exist with regard to Ernest, Davis, P&S, and APW. Wesco seeks to demonstrate that Ernest, Davis, APW, and P&S had formulated a plan to take as many of Wesco's employees as possible through the *en masse* resignation, demonstrating that they had an improper purpose to harm Wesco. To support this argument, Wesco relies on Howe's deposition testimony that Ernest and Davis informed Howe that they knew P&E's employees very well, had a better relationship with them than P&E's owner, and if P&E did not work something out with them, they would take the business from P&E's owner. Howe's testimony was as follows:

Q. And what was the nature of that conversation?

A. Just essentially that they were, you know, interested in the three stores down there and if anything ever become of it, you know, they'd like to do something with the stores down there and that sort of thing.

Q. Anything else you recall about that conversation today?

A. Yeah, that they had a better handle of David's [P&E's owner] business. They knew his employees real well, and they had a better relationship with them than David did and that—you know, I mean, if they couldn't work something out with David, they'd just go take it away from him.

Q. Is that a quote, or is that just your recollection today?

A. That's my reco—it's not an exact quote, but it's a pretty—pretty fair statement of what I recall.

Wesco further contends that by taking as many employees of Wesco's as possible, and leaving Wesco without managers or trained sales staff in the Idaho Stores, when Wesco was new to the Eastern Idaho market, Ernest, Davis, APW, and P&S demonstrated an intent to cause harm to Wesco's economic interests.

However, the only evidence Wesco put forth, besides the actual fact that the employees resigned *en masse,* was the statement by Howe that was a "pretty fair statement" of what Howe recalled of the conversation. This evidence did not raise a genuine issue of material fact regarding Ernest, Davis, APW, and P&S's intentional interference with Wesco's prospective economic advantage.

### 4. Interference with Contracts

"One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability. . . ." Restatement (Second) of Torts § 766 (1979). Liability may arise for tortious interference with a contract even where the contract is terminable at will because, until it has been terminated by one party, the contract is valid and subsisting and a defendant may not improperly interfere with it. Restatement (Second) of Torts § 766 cmt. g. (1979). Tortious interference with contract has four elements: "(1) the existence of a contract; (2) knowledge of the contract on the part of the defendant; (3) intentional interference causing a breach of the contract; and (4) injury to the plaintiff resulting from the breach." *Bybee v. Isaac*, 145 Idaho 251, 259, 178 P.3d 616, 624 (2008). The plaintiff must establish these elements before the burden switches to the defendant to explain the interference with the contracts. *Nw. Bec-Corp v. Home Living Serv.*, 136 Idaho 835, 841, 41 P.3d 263, 269 (2002).

"The 'intent' of the 'intentional interference' requirement can be inferred by the jury from evidence of 'conduct substantially certain to interfere with the [contract].'" *Bybee v. Isaac*, 145 Idaho 251, 259, 178 P.3d 616, 624 (2008) (quoting *Highland Enters., Inc. v. Barker*, 133 Idaho 330, 340, 986 P.2d 996, 1006 (1999)). In *Bybee*, this Court found that there was evidence from which the jury could have inferred Farm Air engaged in conduct substantially certain to interfere with the non-compete agreement because the owner of Farm Air knew of the covenant not to compete, hired Isaac directly after she quit working for Bybee Air, and testified that he did not ask Isaac to refrain from contact with customers of Bybee Air before or after he hired her, nor put any limitations on her ability to contact customers. *Id*.

#### a. Interference with Employee Contracts

Wesco alleged in its First Amended Complaint that Ernest, Davis, P&S, and APW had knowledge of Wesco's contract with the employees, and they intentionally interfered with the employee contracts, which caused a breach of the contract and injury to Wesco. The district court found that there is no evidence in the record to suggest that Wesco employees breached their employment contract with Wesco and, therefore, Wesco cannot maintain this action against Defendants. We agree based upon our determination that a genuine issue of material fact did not exist regarding whether the employees breached their employment contracts with Wesco.

16

### b. Interference with Customer Contracts

Wesco next contends that all Defendants had knowledge of Wesco's contracts with its customers and Defendants intentionally interfered with those contracts, resulting in a breach of the relationships and injury to Wesco. In its First Amended Complaint, Wesco identified three contracts it claimed were interfered with. On appeal, Wesco focuses on one of the contracts, and argues that because the customer is still using the equipment but not purchasing paint from Wesco, evidence of interference has been provided. Defendants argued below that there was no evidence of an injury because the contracts identified by Wesco merely require that any equipment provided to the customers be returned along with any unused product, and therefore Wesco could simply pick up its equipment and bill the customers for any unused paint.

Here, the district court found that a "conditional use contract" was the only contract between Wesco and customers that may have been breached by the customers. The court stated: "There is no other evidence that Wesco customers owed a contractual duty to Wesco to continue to purchase goods and/or services from them. There is no other evidence that such Wesco customers then breached such a contractual duty as a result of any interference in the contractual relationship by any of the Defendants."

The three contracts Wesco identified provided that P&E would supply equipment at no charge in exchange for the customer purchasing products from P&E. As Defendants argued, Wesco could simply pick up its equipment if the customers were no longer purchasing the specified products from Wesco. Therefore, we affirm the district court and find that Defendants did not interfere with Wesco's customer contracts.

### 5. Unfair Competition

Wesco asserts in its First Amended Complaint that Defendants, through their joint and several efforts, purposefully engaged in unfair competition specifically designed to reduce Wesco's ability to compete against Defendants in the automotive paint supply industry and to drive Wesco out of business. The Restatement (Third) of Unfair Competition § 4 provides that one is subject to liability if:

> [I]n connection with the marketing of goods or services, the actor makes a representation likely to deceive or mislead prospective purchasers by causing the mistaken belief that the actor's business is the business of the other, or that the actor is the agent, affiliate, or associate of the other, or that the goods or services that the actor markets are produced, sponsored, or approved by the other.

17

The district court here found that there was a genuine issue of material fact as to whether former employees were engaged in unfair competition by (1) wearing P&E clothing while working for P&S and (2) maintaining and using the P&E cell numbers (with the same recorded telephone messages) for their cell telephones while they worked for P&S. The court thus refused to dismiss any of the former employees or P&S from the allegations in this count, but did dismiss Ernest and APW, as there was no evidence that an action could be maintained against them. However, the court found no evidence that the organizers of P&S used the name to confuse the customers of P&E, as the record indicated that the P&S name was used by the company since 1972.

That employees continued to wear P&E clothing and use P&E cell numbers did create a genuine issue of material fact as to whether the employees were making representations likely to deceive or mislead customers. As Wesco pointed out in its memorandum in opposition to summary judgment, "customers calling on former Wesco Paint & Equipment employees heard Paint & Equipment recordings, saw Paint & Equipment uniforms, called the same cell phone numbers, and dealt with the same people they had been dealing with for years at Paint & Equipment." Thus, the district court was correct in finding that there was a genuine issue of material fact as to whether the former employees and P&S engaged in unfair competition. The district court was also correct in finding that P&S did not use its name to confuse customers of P&E, because the record indicated that the name had been in use since 1972.

### 6. Idaho Competition Act

Wesco contends that Ernest and APW conspired or combined with the employees to unreasonably restrain Idaho commerce by attempting to steal Wesco's customers and employees and to put the Idaho Stores out of business. Idaho Code § 48-102(2) outlines the purpose of the Idaho Competition Act:

> The purpose of this chapter is to maintain and promote economic competition in Idaho commerce, to provide the benefits of that competition to consumers and businesses in the state, and to establish efficient and economical procedures to accomplish these purposes and policies.

Idaho Code § 48-104 then provides: "A contract, combination, or conspiracy between two (2) or more persons in unreasonable restraint of Idaho commerce is unlawful." In *Woodland Furniture, LLC v. Larsen*, this Court stated:

> [Idaho Code § 48-104] requires a claimant to show a purpose to drive another out of business, reflecting the notion that unfair competition laws were enacted to

18

protect competition, not competitors.  Idaho Code § 48-104 strikes the balance between free competition and fair competition by offering relief only where a company can show a competitor's intent to drive the company out of business, rather than simply an intent to compete.

142 Idaho 140, 146, 124 P.3d 1016, 1022 (2005) (internal citation omitted).  The Court then found that, although the defendant's actions were "not commendable" there was no evidence to support the claim that the defendant had an intent to drive the plaintiff out of business.  *Id*. at 147, 124 P.3d at 1023.

The court here found that Wesco could not maintain a cause of action under the Idaho Competition Act because there was no evidence that the defendants were engaged in conduct that would subject them to antitrust actions.  This Court agrees because, while the actions of Ernest in seeking to hire the majority of the Wesco employees to staff stores in the same three cities may not have been "commendable," Wesco's only evidence that the intent was to drive Wesco out of business was Howe's testimony that Ernest commented on taking P&E's business away from them.  That evidence was not enough to raise a genuine issue of material fact.

**7. Computer Fraud**

Wesco asserts that the Idaho Stores maintained computers containing confidential customer information and the employees intentionally accessed the computers without authorization from Wesco for the purposes of obtaining, transmitting, and utilizing the confidential customer information for their own gain.  A violation of the Computer Fraud Abuse Act occurs when one:

(A) knowingly causes the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damage without authorization, to a protected computer; (B) intentionally accesses a protected computer without authorization, and as a result of such conduct, recklessly causes damage; or (C) intentionally accesses a protected computer without authorization, and as a result of such conduct, causes damage and loss.

18 U.S.C.A. § 1030(a)(5).

The district court found that there was undisputed evidence that Cook deleted information from the Wesco computer.  The court dismissed all Defendants except Cook, finding that there was a genuine issue of material fact that Cook's conduct (1) violated 18 U.S.C.A. § 1030(a)(5)(A), and (2) impaired the integrity or availability of data or a program causing loss.

We find that the district court erred on this issue. Cook's admissions and the affidavit of Wes Goodwin were the only pieces of evidence offered that raised a genuine issue of material

19

fact, but it was not shown how damage or loss was caused by Cook's actions. Cook admitted that he deleted his work folder, two personal programs he had brought in (Adobe Photo Shop and Microsoft Office), customer phone lists that had been saved in Microsoft Excel, letters to customers that had been saved in Microsoft Word, and his music folder. Goodwin analyzed the hard drive and concluded that there was a significant indication of deleted and damaged files that appeared to be associated with Wesco operations as well as the computer operating system and that the files were not deleted during the normal course of the computer operation. However, evidence was not offered to show how Cook's deletion of his work folder and the programs he installed on the computer damaged a protected computer as required by 18 U.S.C.A. § 1030(a)(5)(A).

## 8. Idaho Trade Secrets Act

Wesco argues that Defendants, acting jointly and severally, acquired, disclosed or used Wesco's customer information at the Idaho Stores using improper means. Wesco asserts that it maintained confidential customer information at its Idaho Stores including customer names, customer buying preferences, and customer history; this information derives independent economic value and is not readily ascertainable by proper means; Wesco reasonably attempted to maintain the secrecy of the customer information; and the customer information constitutes a "trade secret" under I.C. § 48-801(5).

Idaho Code § 48-801(5) defines a "trade secret" as follows:

[I]nformation, including a formula, pattern, compilation, program, computer program, device, method, technique, or process, that:

(a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

(b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. . . .

In order to prevail in a misappropriation action under the Idaho Trade Secrets Act (ITSA), the plaintiff must show that a trade secret actually existed. *Basic Am., Inc. v. Shatila*, 133 Idaho 726, 735, 992 P.2d 175, 184 (1999). In *Basic American*, this Court looked to the Restatement for six factors that can be used to show that given information is a trade secret:

(1) the extent to which the information is known outside [the plaintiff's] business;
(2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by him to guard the secrecy of the

20

information; (4) the value of the information to him and his competitors; (5) the amount of effort or money expended by him in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Id*. (quoting Restatement of Torts § 757 cmt. b (1939)) (alteration in original). All of these factors address the issue of whether the information in question is generally known or readily ascertainable. *Id*.

In *Northwest Bec-Corp v. Home Living Service, Inc.*, the issue was whether actual misappropriation, as defined by I.C. § 48-801(2), occurred. 136 Idaho 835, 839, 41 P.3d 263, 267 (2002). The Court agreed with the district court's finding that "the legislature did not intend the statute to be read so broadly as to preclude the hiring of an employee from a competitor; the legislature also did not intend that merely hiring a competitor's employee constitutes acquiring a trade secret." *Id*. at 840, 41 P.3d at 268. Instead, "[a]n employee will naturally take with her to a new company the skills, training, and knowledge she has acquired from her time with her previous employer. This basic transfer of information cannot be stopped, unless an employee is not allowed to pursue her livelihood by changing employers." *Id*. In *Northwest Bec-Corp*, the Court found that, despite the evidence that – after the defendant left her employment with the appellants – approximately ninety customers ended their business relationship with the appellants and began doing business with the defendant's new place of business, defendants nevertheless established the absence of any genuine issue of material fact through the affidavits they submitted providing alternative explanations for the customer changes. *Id*. at 840-41, 41 P.3d at 268-69.

Here, based on the evidence in the record, the district court found that there was a genuine issue of material fact as to whether Cook's actions with the Wesco computer violated ITSA because customer lists, lists showing customer buying preferences, the history of customer purchases, and custom paint formulas are trade secrets. The court further found that there was no evidence that Wesco's former employees used Wesco's trade secrets to cause the customers to buy their products from P&S.

We affirm the district court on this issue. Wesco did not raise a genuine issue of material fact that any of the employees other than Cook took customer lists, lists showing customer buying preferences, the history of customer purchases, and custom paint formulas through the evidence it presented. To the extent that customers left Wesco and began using P&S, the

depositions of the employees indicate that this was due to the relationships the employees had developed with the customers and not trade secrets taken from Wesco.

### 9. Civil Conspiracy

Wesco contends that Defendants associated together for the unlawful objective of putting the Idaho Stores out of business, stealing Wesco's customers, and unlawfully restricting Wesco's lawful competition against Defendants. Wesco further asserts that Defendants combined and conspired to reach an agreement with respect to the employees' resignations from Wesco, the employees' solicitation of customers while still employed for Wesco, and to drive the Idaho Stores out of business. Wesco argues that Defendants employed unlawful means to accomplish these purposes.

"A civil conspiracy that gives rise to legal remedies exists only if there is an agreement between two or more to accomplish an unlawful objective or to accomplish a lawful objective in an unlawful manner." *McPheters v. Maile*, 138 Idaho 391, 395, 64 P.3d 317, 321 (2003). Civil conspiracy is not an independent claim for relief because "[t]he essence of a cause of action for civil conspiracy is the civil wrong committed as the objective of the conspiracy, not the conspiracy itself." *Id*. Furthermore, there must be specific evidence of a plan or agreement to demonstrate the existence of the conspiracy at the time the allegedly unlawful objective was accomplished. *Mannos v. Moss*, 143 Idaho 927, 935, 155 P.3d 1166, 1174 (2007). In *Mannos*, the plaintiff argued that the fraudulent acts that the defendants engaged in to induce him to invest in a company constituted the underlying civil wrong. *Id*. However, the Court found that the plaintiff failed to offer, and the records failed to contain, any specific evidence regarding an alleged agreement or plan among the defendants to defraud him. *Id*.

The district court here stated: "While the Court has found genuine issues of fact concerning those who have allegedly committed wrongs alleged in the complaint, the Court finds no evidence of an agreement between two or more to accomplish these civil wrongs." We affirm the district court on this issue, as the record is devoid of specific evidence of an agreement or plan to commit wrongful acts between any two defendants.

### 10. Conversion

Wesco alleged in its First Amended Complaint that Defendants wrongfully took and converted property belonging to Wesco. However, Wesco did not add the conversion claim until its amended complaint, and therefore Defendants did not move for summary judgment on the

issue. (Counsel for Defendants: "My review of [the amended complaint] didn't affect my motion for summary judgment, other than the conversion thing I haven't had a chance to respond to, as far as making a motion for summary judgement [sic] on the conversion."). However, the district court, while recognizing that Defendants had not moved for summary judgment as to this cause of action, found that there could only be a genuine issue of material fact as to the actions of Cook, Johnston, and Cristobal on this count. We find that the district court erred in addressing this issue, as it had not been raised by Defendants in their Motion for Summary Judgment.

## III. CONCLUSION

This Court affirms the district court's grant of partial summary judgment on all issues except (1) computer fraud, as we hold that the district court erred in not granting summary judgment to Cook; and (2) conversion, as we hold that the issue was not properly before the district court. The case is remanded for further proceedings consistent with this opinion.

Chief Justice EISMANN, and Justices W. JONES and HORTON CONCUR.

Justice J. JONES, dissenting in part.

Although I concur for the most part in the Court's opinion, I am unable to agree that Ernest, Davis and P&S (the P&S defendants) should not have to answer to a jury on the claims addressed in Parts II.B.3 and 4.a of the opinion. This case does not present a situation where each employee, acting in his or her own interest, decided to terminate employment with Wesco to pursue employment with P&S. A number of the employees who switched to P&S had the encouragement of Wesco's managerial employees, acting on the inside, with what certainly appears to be assistance from the outside by the P&S defendants. I believe the inferences to be drawn from the evidence, when viewed most favorably to Wesco, would support the vacation of the summary judgment for the P&S defendants, leaving it to a jury to decide whether they committed actionable conduct.

With regard to Part II.B.3, I agree with the Court's conclusion that a genuine issue of material fact exists as to whether the claimed violation of the employees' fiduciary duty may also support Wesco's claim for interference with prospective economic advantage. However, I disagree with the Court's conclusion that there is no genuine of issue of material fact on this claim with regard to the P&S defendants.

In affirming the dismissal of Wesco's claims against the P&S defendants, the Court notes that the "only evidence" Wesco put forth was the en masse resignation of Wesco's employees, and testimony by Howe that Ernest and Davis informed him that they would attempt to take Wesco's business. This evidence must be considered in context. The record also establishes that Davis and Ernest attempted to obtain as many Wesco employees as possible. Specifically, Davis was asked:

Q.    Who came up with this idea, let's see how many of [Wesco's] employees we can take from Wesco?

A.    It would be Holley Ernest and myself.

Q.    All right. When did you come [up] with this idea?

A.    It would have been probably after the 12th or shortly before the 12th, sometime in that area.

In my mind, this evidence is sufficient to raise a genuine issue of material fact as to whether the P&S defendants engaged in the tort of interference with prospective economic advantage. Viewed in the light most favorable to Wesco, evidence that a substantial majority of Wesco's workforce, including nearly all of Wesco's top managerial employees, resigned on August 19, 2005, and began working for P&S by August 22, 2005, raises *at least* a colorable inference that Dayley, Johnston, Brady, Cook, and Hancock all violated their respective duty of loyalty to Wesco at the behest of the P&S defendants. It is clear from the record that these employees were not acting with the intent to go out and personally compete against Wesco. Rather, they were obviously acting, while employees of Wesco, to advance the interests of its intended competitor, P&S. It is certainly reasonable to infer from the evidence that the P&S defendants, at the least, were applauding these disloyal acts and, at the most, requesting that they be done. Absent the interest of the P&S defendants, the individual employees would not have had the impetus to treat their new employer, Wesco, in a disloyal fashion.

And, these acts are not the only acts of apparent disloyalty that might have been beneficial to the P&S defendants. The record discloses that Brady first met with Ernest and Davis on August 10. Between that time and August 19, Brady and Ernest exchanged at least 64 cell phone calls. During this time, Brady met with Ernest to scout out potential store sites for P&S. He placed a number of calls to locate store sites, and he contacted governmental agencies

about business licenses for P&S. An employee may certainly make arrangements so as to personally compete against his or her present employer, but may not, without breaching his duty of loyalty, do so for the benefit of a third party who will be competing against his present employer. Brady's plan here was not to set up his own competitive business but, rather, to assist a third-party competitor. Taking action to arrange for the acquisition of potential store sites that the third party can use to compete against the present employer would certainly be antagonistic to the present employer's interests, just like trying to surreptitiously acquire the employer's leasehold on premises to be used for competing against the employer, which we held to be a violation of the duty of loyalty in *Twin Falls Farm & City Distrib.*, *Inc. v. D&B Supply Co.*, 96 Idaho 351, 355, 528 P.2d 1286, 1290 (1974).

Furthermore, Brady was claimed by P&S to be its employee three days prior to his resignation from Wesco. Meanwhile, Brady's fellow Wesco employee, Cook, was engaged in copying and deleting from his computer a variety of documents including customer lists, lists showing customer buying preferences, the history of customer purchases, and custom paint formulas.

Were these allegedly disloyal employees acting strictly for their own benefit, trying to curry favor with a new employer, or were they acting at the behest of that new employer? Where there is smoke, there may well be fire. When the inferences from the record are drawn in favor of Wesco, there is adequate evidence to support the premise that the P&S defendants were the instigators of the wrongful conduct and that they should be held to answer to a jury as to whether they committed the tort of interference with prospective economic advantage. I would vacate the summary judgment in favor of the P&S defendants on this claim.

With regard to Part II.B.4.a, I would vacate the summary judgment in favor of the P&S defendants. In my estimation, there is sufficient evidence, indicating that these defendants interfered with the contractual relationship between Wesco and some of its employees, to survive summary judgment. While I would agree that there is no real evidence that the P&S defendants directly interfered with the contractual relationships, there is sufficient evidence to draw the inference that the managerial employees who solicited other employees to quit Wesco and join P&S were acting at the behest of the P&S defendants. There is certainly evidence to support an inference that the P&S defendants regarded Brady as their agent, because P&S indicated in a letter dated August 16, 2005, that Brady was an employee of P&S. This was three days prior to

the effective date of his resignation from his employment with Wesco. An employee at will may terminate his own employment at any time, without liability. However, an employee may not solicit other employees to terminate their employment for the benefit of another employer without violating the duty of loyalty. *D&B Supply Co.*, 96 Idaho at 358, 528 P.2d at 1293. If the managerial employees, Brady, Cook, and Dayley, were soliciting other employees to switch their employment at the urging of the P&S defendants, a reasonable inference to be drawn from the record, the summary judgment on this claim should be vacated and the issue be submitted to the jury for determination.

Thus, I would vacate the summary judgment against Wesco and in favor of the P&S defendants on the claims addressed in Parts II.B.3 and 4.a.